**Roal WAAG, Plaintiff,**

v.

**THOMAS PONTIAC, BUICK, GMC, INC. d/b/a Thomas Auto Mall, a Corporation, and Tom Bistodeau, an Individual, Defendants,**

**U.S. Equal Employment Opportunity Commission, Amicus Curiae.**

Civil No. 3–95–538.

United States District Court,
D. Minnesota,
Third Division.

April 12, 1996.

394

Steven A. Smith of Nichols Kaster & Anderson, Minneapolis, MN, for Plaintiff.

Matthew E. Damon of Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, for Defendants.

Gail S. Coleman of the United States Equal Employment Opportunity Commission, Office of the General Counsel, Washington, DC, for the Equal Employment Opportunity Commission, as Amicus Curiae.

## ORDER

LEBEDOFF, United States Magistrate Judge.

The above-entitled matter came on for hearing before the undersigned Magistrate Judge of District Court on February, 29, 1996, on Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Defendants seek dismissal of Plaintiff's claims under 1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 2) the Minnesota Human Rights Act, Minnesota Statutes, § 363.01 et seq., and 3) Minnesota common law for assault and battery.

Pursuant to 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties have voluntarily waived their right to proceed before a judge of the United States District Court and have consented to have the undersigned United States Magistrate Judge conduct any and all further proceedings in the case, including entry of final judgment.

On March 27, 1996, this Court granted a motion by the U.S. Equal Employment Opportunity Commission (EEOC) for leave to participate as amicus curiae. The EEOC accordingly submitted its brief as amicus curiae in opposition to Defendants' Motion for Summary Judgment. In a very well reasoned amicus brief, the EEOC took a strong position that Title VII does indeed cover same-gender sexual harassment. While we are obviously not bound by the EEOC's position on this issue, we do note that the EEOC is charged by Congress with interpreting, administering, and enforcing Title VII. Our reasoning in this case with respect to same-gender sexual harassment under Title VII closely parallels that of the EEOC.

## I. BACKGROUND

In December 1993, Plaintiff Roal Waag (Waag) began working at Defendant Thomas Pontiac (Thomas Pontiac) as a used car salesperson. The first six months of Waag's employment at Thomas Pontiac appear to have been uneventful. On June 1, 1994, however, Thomas Pontiac hired Defendant Tom Bistodeau (Bistodeau) as its new General Sales Manager. As the General Sales Manager, Bistodeau directly supervised Waag until Waag resigned two and a half months later on August 15, 1994. Waag alleges that he terminated his employment with Thomas Pontiac because Bistodeau sexually harassed him to the point that the working conditions were intolerable.

According to Waag, Bistodeau began sexually harassing him during the first week of Bistodeau's employment. (Deposition of Roal Waag [hereinafter "Waag Depo."] at 38, attached as Ex. A to Damon Aff.) Specifically, Waag alleges that Bistodeau approached him from behind, reached around him and touched his stomach while saying "You stay in shape!" (Id. at 90.) Over the next month and half, Waag claims that Bistodeau touched him almost daily. (Id.) Although Plaintiff thought this conduct was "very weird," he did not immediately conclude that

the physical contact was sexual in nature. (*Id.* at 90–1.)

On July 18, however, Waag claims that Bistodeau touched him on both the stomach and the knee while telling sexual jokes referring to two men performing "blow jobs" on each other. (*Id.* at 44.) At this point, Waag allegedly told Bistodeau not to touch him and asked him, "What's wrong with you?" (*Id.*) Bistodeau allegedly responded by telling another joke. (*Id.*) Over the next ten days, Waag alleges that following incidents transpired:

- On July 19, Bistodeau touched Waag again. This time by placing his hands on Waag's buttocks for a period of time. (*Id.* at 45.) Waag pushed Bistodeau's hand away and asked him, "What are you doing?" (*Id.*) Waag claims he was "visibly upset" by Bistodeau's conduct on this occasion. (*Id.*)

- On July 21, Bistodeau again touched Waag's stomach. (*Id.* at 46.) At this point, he told Bistodeau he did not like being touched and that Bistodeau should stop doing it. (*Id.*) Bistodeau responded by saying, "I'm the General Sales Manager and I do what I want." (*Id.* at 47.)

- On July 22, Bistodeau pulled Waag's chest hair. (*Id.* at 47.) After Waag told him to "knock it off," Bistodeau laughed and chuckled, and then pulled Waag's leg hair. (*Id.* 47–8.) At the time, Waag was wearing shorts and had his shirt open because he was working at an outdoor tent sale. (*Id.* at 48.)

- Later on July 22, Bistodeau and Waag got into an argument over a bid on a potential trade-in vehicle.[1] (*Id.* at 49.) After Waag complained to Bistodeau about a low bid, Bistodeau said, while staring at Waag's crotch area and grinning, "You know what you can do if you want a bigger bid on this one." (*Id.* at 49–50.) Waag told Bistodeau, "You know—I'm sick of you." (*Id.*) Bistodeau responded, "Come on. Let's take a ride and I'll show you what life's all about." (*Id.*) By offering a low bid, Bisto-

deau allegedly denied Waag a higher commission on the trade-in vehicle. (Amended Complaint ¶ 14(f).)

- On July 25, Bistodeau again told Waag sexually explicit jokes involving two men. (*Id.* at 54.)

- On July 26, Bistodeau came up from behind Waag, grabbed his hand as if to hold hands, placed his other hand on Waag's shoulder, and rubbed his stomach against Waag's lower back. (*Id.* at 58–9.) Waag pulled away immediately and yelled that he was "sick" of Bistodeau's conduct. (*Id.*)

- On July 28, Bistodeau asked Waag to help him move an automobile display across the showroom floor. (*Id.* at 59.) While moving the display, Bistodeau told Waag he had "a nice ass." (*Id.* at 60–1.)

Waag also claims that other male employees told him that Bistodeau harassed them in the same manner. (*Id.* at 70–1.)

Bistodeau, however, denies that he ever made physical contact with Waag other than to shake his hand. (Deposition of Tom Bistodeau [hereinafter "Bistodeau Depo."] at 55–61, attached as Ex. H to Damon Aff.) He also denies that he ever touched other male employees, except to shake their hands or pat them on the back. (*Id.* at 56.) According to Bistodeau, his relationship with Waag was strained because he had warned or reprimanded Waag on several occasions regarding poor interpersonal relationships with co-workers, threats directed at co-workers, and absenteeism. (*Id.* at 62–8.) Waag contends that he had no such problems with Bistodeau. (Waag Depo. at 79–80, 84.)

Although Waag did not immediately report any of these alleged incidents to any of Thomas Pontiac's supervisors, (Waag Depo. at 40–2), as the company's sexual harassment policy suggests,[2] he claims to have discussed Bistodeau's alleged harassment with Mark Morris, Thomas Pontiac's Vice–President. (*Id.*) Waag is unable to specify when this conversation took place, (*id.* at 40), but

---

1. Bistodeau agreed to take a car from one of Waag's customers as a trade-in, but offered to do so only for an amount "way below loan value." (Waag Depo. at 49.)

2. Thomas Pontiac's sexual harassment policy statement directs employees to "[i]mmediately report the [sexual] harassment incident to any supervisor and the Company's EEO Manager." (Ex. B of Damon Aff.)

claims that he told Morris that Bistodeau was "really weird" and that there was something wrong with him, (*id.* at 41). He also allegedly told Morris that he thought Bistodeau was a homosexual, that Bistodeau repeatedly touched him and other members of the sales staff, and that he wanted the touching to stop. (*Id.* at 41–2.) Morris allegedly responded to Waag's complaint by laughing. (*Id.*) Thomas Pontiac apparently did not investigate Waag's complaint. Waag also claims he told several other employees about Bistodeau's conduct. (*Id.* at 64.) On August 15, 1994, Waag resigned, allegedly because the working conditions had become "hostile." (*Id.* at 101–2, 132.) This lawsuit arose as a result of Bistodeau's alleged conduct.

Subsequent to Waag's resignation, Thomas Pontiac discovered that Waag had falsified his job application by omitting that he had previously been terminated by another auto dealership after pleading guilty to a criminal charge. (1st Morris Aff.) In April 1992, Waag pleaded guilty to participation in a criminal conspiracy to steal an automobile from the dealership where he was employed. (Criminal Complaint attached as Ex. C to Damon Aff.) According to the criminal complaint, Waag gave the key to a $35,000 automobile to a co-conspirator in exchange for $1,000. (*Id.*) The automobile was subsequently stolen and Waag was paid the cash. (*Id.*) The co-conspirator, however, was a police informant and Waag was arrested after receiving the cash. (*Id.*) After pleading guilty, his sentence was stayed and he was placed on probation. Waag's employer at the time terminated his employment as a result of this incident. (Separation Notice attached as Ex. E to Damon Aff.) Sometime thereafter, Waag sought employment at Thomas Pontiac. Thomas Pontiac claims it would have terminated Waag immediately upon discovering that he had falsified his job application and been convicted of this crime. (1st Morris Aff.; 2d Morris Aff.)

## II. STANDARD OF REVIEW

■■■ The Court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors that for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The evidence produced need not be in a form that is admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■■■ The substantive law will identify which facts are "material." A "material fact" is one that will affect the result or outcome of the case, depending on its resolution. *Id.* at 248, 106 S.Ct. at 2510. Factual disputes that are irrelevant or unnecessary will not be considered. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. *See generally*, 10A Charles A. Wright *et al.*, *Federal Practice and Procedure: Civil 2d* § 2725, at pp. 89–95 (1983).

■■■ A "genuine" issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. *See generally*, 10A *Federal Practice and Procedure: Civil 2d* § 2725, at pp. 95–109. On a motion for summary judgment, the Court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Nor may the nonmoving party simply argue that facts supporting its claim will be developed later or at trial. Rather, the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Id.* If reasonable minds could differ as to the import of

the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Bearing these principles in mind, we turn to the merits of Plaintiff's claims.

## III. DISCUSSION

### A. *Same–Gender Sexual Harassment Claims Under Title VII*

▆ According to Defendants, same-gender sexual harassment claims are not actionable under Title VII or the Minnesota Human Rights Act (MHRA).[3] At the outset, we note that this case involves an allegation of same-gender sexual harassment, as opposed to any other type of harassment. As a result, we will confine our discussion to the narrow issue of whether Title VII protects employees from sexual harassment by members of the same gender. More specifically, the question is whether a plaintiff may establish a violation of Title VII by proving that a supervisor harassed a subordinate of the same gender, either by creating a "hostile work environment" or through *quid pro quo* harassment, because of the subordinate's sex. To date, neither the Supreme Court nor the Eighth Circuit Court of Appeals has addressed this precise issue. The courts that have considered the matter are deeply divided. After carefully considering the matter, however, we conclude that Title VII does protect employees against same-gender sexual harassment.[4]

In support of their position, Defendants cite *Garcia v. Elf Atochem North Am.,* 28 F.3d 446 (5th Cir.1994). In *Garcia,* the plaintiff alleged that his male supervisor sexually harassed him by grabbing his crotch area and making sexual motions from behind him on several occasions. *Id.* at 448. There, the court rejected his claim, noting that although the conduct complained of had "sexual overtones," " '[h]arassment by a male supervisor against a male subordinate does not state a claim under Title VII.' " *Id.* (alteration in original) (quoting an unpublished Fifth Circuit opinion). The court, however, offered. no rationale for its broad holding. Instead, it cited with approval *Goluszek v. H.P. Smith,* 697 F.Supp. 1452, 1456 (N.D.Ill. 1988), another case upon which Defendants rely.

In *Goluszek,* the plaintiff, who was by his own admission "abnormally sensitive to comments pertaining to sex," filed a sexual harassment claim under Title VII alleging that his co-workers harassed him, *inter alia,* about his lack of sexual experience. *Id.* at 1453–54. Significantly, the plaintiff did not allege that anyone had made unwelcome sexual advances or that the conduct was directed only at male employees. In considering his claim, the court concluded that "the defendant's conduct was not the type of conduct Congress intended to sanction when it enacted Title VII." *Id.* at 1456. According to the court, "Congress was concerned about . . . an imbalance of power and an abuse of that imbalance by the powerful which results in discrimination against a discrete and vulnerable group." *Id.* (citing Note, *Sexual Harassment Claims of Abusive Work Environment under Title VII,* 97 Harv.L.Rev. 1449, 1451–52 (1984)). In light of this perceived purpose, the court rejected the plaintiff's claim because he was "a male in a male dominated environment." *Id.* According to *Goluszek,* "actionable sexual-harassment [must] fos-

---

3. Because Minnesota courts have yet to consider whether the MHRA's proscription of discrimination on the basis of sex protects against same-gender sexual harassment, we construe the MHRA as offering protection analogous to that provided by Title VII. *See Lenhardt v. Basic Inst. of Technology, Inc.,* 55 F.3d 377 (8th Cir.1995) (construing Missouri Human Rights Act in manner consistent with Title VII where Missouri Supreme Court had yet to address issue presented); *See also Danz v. Jones,* 263 N.W.2d 395, 398–99

(Minn.1978) ("This court has applied principles developed in court decisions under Title VII for purposes of construing . . . [the MHRA].").

4. Given that our holding on this issue is identical to that announced in an earlier state district court decision in this case, we need not address Plaintiff's "law of the case" argument in this context.

ter[ ] a sense of degradation in the victim by attacking their sexuality." *Id.*

We are not persuaded by the rationale articulated in *Goluszek* and its progeny. Title VII of the Civil Rights Act of 1964 protects employees from unfair employment practices by making it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Although the statutory text does not expressly provide for same-gender sexual harassment claims, the language does not foreclose the possibility of such claims. Indeed, the language is gender neutral and by its terms prohibits discrimination "because of such individual's ... sex." *Id.*

■ Consistent with this language, the Supreme Court has recognized that the "simple test" for identifying discrimination based on, or "because of," an individual's sex is whether that person received treatment "in a manner which but for that person's sex would be different." *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978). Thus, although the legislative history indicates that Congress may have added the word "sex" to Title VII with the goal of protecting women from unfair employment practices,[5] the Court has interpreted the Act broadly to protect both men and women employees. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89 (1983) (holding that an employer's insurance plan violated Title VII by discriminating against male employees). Today there is no question that "[m]ale as well as female employees are protected against discrimination" by Title VII. *Id.*

In view of the Supreme Court's willingness to protect men from unfair employment practices in *Newport News,* the notion that Congress enacted Title VII only to protect against abuses resulting from "an imbalance of power" is untenable. Had the Court thought this were case, it would have had to find such an "imbalance of power" existed before extending Title VII's protection to the male plaintiffs in *Newport News.* The Court's opinion, however, neither makes such a finding nor mentions the idea that Title VII was designed to protect only against workplace discrimination by a "dominant" gender.

Furthermore, in holding that Title VII protected employees from "discriminatory sexual harassment," the Supreme Court recognized that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, F.S.B. v. Vinson,* 477 U.S. 57, 64–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). In *Meritor,* the Court considered the Equal Employment Opportunity Commission's (EEOC) guidelines[6] describing the kinds of workplace conduct that may be actionable under Title VII and concluded that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66, 106 S.Ct. at 2405. The Court also recognized that "sexual harassment" involving "the grant or denial of an economic *quid pro quo*" would be actionable. *Id.* at 65, 106 S.Ct. at 2404. Before reaching its conclusions, however, the Court not-

---

5. The word "sex" was added just two days before the House of Representatives passed Title VII. 110 Cong.Rec. 2577–84. Congressman Smith proposed the amendment addition to "prevent discrimination against ... women." *Id.* at 2577. In response to objections to the proposed addition, Congresswoman May argued that "it is only just and fair to give all women protection against discrimination." *Id.* at 2582. She added, however, that her support of the bill was "an endeavor to have all persons, men and women, possess the same rights and opportunities." *Id.* at 2583. Ultimately, the House adopted Congressman Smith's amendment. *Id.* at 2584.

6. The Court noted that although not controlling, the EEOC guidelines constituted "a body of experience and informed judgment to which courts and litigants may properly resort to for guidance." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944))).

ed that Congress "left ... little legislative history to guide us in interpreting the Act's prohibition against discrimination based on 'sex.'" *Id.* at 64, 106 S.Ct. at 2404. Given the Court's broad, gender-neutral holding, it is apparent that it did not believe, as *Goluszek* suggests, that Congress enacted Title VII only to protect "a discrete and vulnerable group" from oppression by a "dominant" gender.

Moreover, in deciding the standard for what constitutes a "hostile work environment" for purposes of Title VII, the Supreme Court announced that the creation of "an environment that a reasonable person would find hostile or abusive" violates the Act.[7] *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Thus, the issue is one of fact which can only be determined by "looking at all the circumstances." *Id.* at 23, 114 S.Ct. at 371. According to the Court, factors to consider include, but are not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Nowhere does the Court state that a plaintiff must prove that the "hostile environment" resulted from "an imbalance of power" due to a "dominant" gender. Thus, while proving that "an imbalance of power" resulted in an atmosphere of oppression may be *sufficient* to meet the "hostile environment" standard, such a showing is not *necessary* to prevail on a "hostile environment" claim. For all of these reasons, we decline to follow the reasoning of *Goluszek*.[8]

On the contrary, we agree with the EEOC's interpretation of the Title VII and those courts that have found same-gender sexual harassment actionable under Title VII. According to the EEOC Compliance manual,

> The victim does not have to be of the opposite sex from the harasser. Since sexual harassment is a form of sex discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. The victim and the harasser may be of the same sex where, for instance, the sexual harassment is based on the victim's sex (not on the victim's sexual preference) and the harasser does not treat the employees of the opposite sex the same way.

EEOC Compliance Manual, § 615.2(b)(3).[9] We see no logic in altering existing law by tacking on a requirement that the perpetrator and victim in a sexual harassment suit under Title VII be of the opposite sex. As the Supreme Court has emphasized, "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406 (citing EEOC Guidelines). In the context of Title VII sexual harassment claims, we cannot identify any persuasive reason to distinguish "unwelcome" heterosexual advances from "unwelcome" homosexual advances.[10] In both instances the victims would not be subject to the harassment "but for" their gender. Furthermore, like "unwelcome" heterosexual advances, "unwelcome" homosexual advances may manifest themselves as *quid pro quo* harassment or create the same type of "hostile" work environment that Title VII protects against. In addition, imposing an "opposite-sex" require-

---

7. The Court also noted that the victim must have "subjectively" perceived the environment to be "hostile" or "abusive" to prevail under Title VII. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

8. Defendants also cite *Hopkins v. Baltimore Gas & Elec. Co.*, 871 F.Supp. 822 (D.Md.1994) in support of their position. Since *Hopkins* adopts the holding and rationale of *Goluszek*, we do not address it separately. *See Hopkins*, 871 F.Supp. at 834.

9. Consistent with these guidelines, the EEOC has submitted an amicus brief urging this Court to hold that same-gender sexual harassment claims are actionable under Title VII. *See also supra* note 6.

10. While this case involves an allegedly homosexual perpetrator and a heterosexual victim, our holding would protect a homosexual victim from "unwelcome" advances of an allegedly homosexual perpetrator. We do not, however, address whether Title VII would protect employees against sexual harassment by a bi-sexual perpetrator.

ment would allow a homosexual supervisor to legally engage in conduct that a heterosexual supervisor would otherwise be prohibited from engaging in.

Finally, we are not persuaded that "same-gender" sexual harassment claims should be barred because such claims may bring an alleged perpetrator's sexual orientation into question. Barring same-gender sexual harassment claims for this reason would strike the wrong balance between the interests of the victim and the alleged harasser. The potential for reputational harm to the alleged harasser accompanies any sexual harassment claim. By allowing sexual harassment claims under Title VII, however, the Supreme Court has implicitly struck this balance in favor of the victim. Striking a different balance here would imply that an allegation of homosexuality on the part of the alleged perpetrator presents a greater risk of harm to that person than would otherwise exist in a sexual harassment suit involving a heterosexual perpetrator. In our view, if such a difference exists, it would be insufficient to warrant barring "same-gender" sexual harassment claims.

Consistent with our position, a number of courts have held that Title VII protects employees against sexual harassment by members of the same gender. *King v. M.R. Brown, Inc.,* 911 F.Supp. 161, 168 (E.D.Pa. 1995) (holding that same-gender sexual harassment is actionable where alleged harasser was homosexual woman); *Ecklund v. Fuisz Technology, Ltd.,* 905 F.Supp. 335, 340 (E.D.Va.1995) (holding same-gender sexual harassment claim viable where female employee made sexual advances to another female employee); *E.E.O.C. v. Walden Book Co., Inc.,* 885 F.Supp. 1100, 1104 (M.D.Tenn. 1995) (holding that same-gender sexual harassment is actionable where male homosexual supervisor harassed a male subordinate); *Prescott v. Indep. Life & Accident Ins. Co.,* 878 F.Supp. 1545, 1551 (M.D.Ala. 1995) (holding that *quid pro quo* claim involving allegedly homosexual male perpetrator was actionable under Title VII); *McCoy v. Johnson Controls World Serv. Inc.,* 878 F.Supp. 229, 232 (S.D.Ga.1995) (holding same-gender sexual harassment claim viable under Title VII). Furthermore, several cir-

cuit courts have indicated in dicta that they would recognize these claims. *See Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 430 (7th Cir.1995) ("[W]e do not ... exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases.") (Posner, J.); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994) ("[W]e do not rule out the possibility that both men and women ... have viable claims against [the male defendant] for sexual harassment."); *Bundy v. Jackson,* 641 F.2d 934, 942 n. 7 (D.C.Cir. 1981) (recognizing that sexual harassment claim may lie where a homosexual supervisor harasses an employee of the same gender) (citing *Barnes v. Costle,* 561 F.2d 983, 990 n. 55 (D.C.Cir.1977)).

We also note that Defendants' reliance upon *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191 (4th Cir.1996) (holding that a hostile environment claim under Title VII does not lie where the alleged harasser and victim are heterosexuals of the same gender) and *Vandeventer v. Wabash Nat. Corp.,* 867 F.Supp. 790 (N.D.Ind.1994) (holding that same-sex harassment is not actionable under Title VII) (citing *Goluszek v. H.P. Smith,* 697 F.Supp. 1452, 1456 (N.D.Ill. 1988)) is misplaced. In *McWilliams,* the court noted that "most significantly," its holding did not "purport to reach any form of same-sex discrimination claim where either victim or oppressor, or both, are homosexual or bisexual." *McWilliams,* 72 F.3d at 1195 n. 4. Instead, the court expressly reserved the question whether "the homosexuality of any [person] may make the claim nevertheless cognizable as one of 'discrimination because of [the victim's sex].'" *Id.* (second alteration in original).

Likewise, upon reconsideration, the *Vandeventer* court stated "it would be going too far to state that there is *never* any possible basis of relief for same-sex sexual harassment under Title VII." *Vandeventer v. Wabash Nat. Corp.,* 887 F.Supp. 1178, 1181 (D.Ind.1995) (emphasis in original). After acknowledging that the "'crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other

sex,' whether or not the victim is of the opposite sex of the harasser," the court concluded "a man can state a claim under Title VII for sexual harassment by another man *only* if he is being harassed *because* he is a man; the relative genders are irrelevant." *Id.* at 1181 (emphasis in original).

Finally, Defendants urge us to follow *Jasmer v. MICO, Inc.,* No. CV3–95–362 (D.Minn.1995) (Magnuson, C.J.) (unpublished opinion). *Jasmer* involved a male homosexual who alleged that he was harassed by male co-workers because of his *sexual orientation. Id.* at 3. Chief Judge Magnuson, in a short two page discussion, held that Title VII, first, did not protect against discrimination on the basis of sexual orientation; and, second, did not provide a cause of action for same-gender harassment claims. *Id.* at 3–4. We believe the instant case is distinguishable from *Jasmer.* First, as *Jasmer* involved discrimination on the basis of sexual orientation, it is distinguishable on its facts from the instant case, which involves same-gender sexual harassment. Second, in reaching its conclusion that same-gender harassment claims are not actionable under Title VII, the court relied primarily on *Garcia, Hopkins,* and *Vandeventer* to support its holding. For all the foregoing reasons, we hold that same-gender sexual harassment claims are actionable under Title VII and the MHRA. As a result we decline to grant Defendants' motion for summary judgment on this ground.

### B. *Quid Pro Quo and Hostile Environment Claims*

Consistent with *Meritor,* the Eighth Circuit has held that both "hostile environment" and *quid pro quo* sexual harassment claims may be brought under Title VII. *Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996) (citing *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993) for elements of prima facie "hostile environment" case); *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995) (citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 186 (6th Cir.1992), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992) for elements of prima facie *"quid pro quo"* case). According to *Callanan,* to prevail on a hostile work environment claim under Title VII, the plaintiff must establish that:

> (1) he belongs to a protected group; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment.

*Callanan,* 75 F.3d at 1296. In *Kopp* the court stressed that "the key issue 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Kopp,* 13 F.3d at 269 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). The only difference with respect to prevailing on a *quid pro quo* claim is that the plaintiff must show, with respect to the second element, that he was subject to sexual harassment in the form of unwelcome sexual advances or requests for sexual favors. *Cram,* 49 F.3d at 473.

Defendants argue that even if Title VII covers same-gender sexual harassment, the conduct complained of is not "discriminatory" under Title VII because it was not based on Plaintiff's gender. Defendants insist that the instant case is analogous to *Fox v. Sierra Dev. Co.,* 876 F.Supp. 1169 (D.Nev. 1995), a case in which the plaintiffs alleged that supervisors and co-employees "engaged, in an open and notorious manner, in the writing, drawing, and explicit discussion of homosexual sex acts." *Id.* at 1172. In rejecting the plaintiff's claim, the court asserted that "[t]his is a form of hostility or abuse which is not discriminatory on the basis of sex or gender." *Id.* at 1175. According to the court, the plaintiffs did not "perceive the work environment to be hostile because they are men. Plaintiffs perceive it to be hostile or abusive to them because they, like some members of society, may not be entirely at ease with sexuality in general and homosexuality in particular." *Id.*

We disagree with Defendant's analogy. First, unlike the instant case, the *Fox* court expressly noted that "[t]here are no facts alleged indicating a *quid pro quo* form of harassment existed." *Id.* Here, Waag has specifically claimed that Bistodeau, an al-

leged homosexual, offered him a financial incentive in the form of a higher bid on a used-car trade-in to engage in sexual relations. The essence of this claim is that "but for" Waag's gender, he would not have been subjected to these alleged unwelcome sexual advances. Second, in *Fox,* the plaintiff's hostile environment claim was based solely on an allegation that other employees, including supervisors, discussed homosexual acts among themselves. The plaintiffs did not allege that they would have been treated differently "but for" their gender. Indeed, the conduct complained of did not appear to be specifically directed at any one gender or individual. Here, however, Waag contends that Bistodeau directed the complained of conduct only at male employees. Furthermore, he has offered affidavits of other male employees supporting this assertion. *See* Astrip Aff. attached as Ex. A to Smith Aff.; Monsrud Aff. attached as Ex. B to Smith Aff. In short, we believe that the question whether Bistodeau treated Plaintiff differently from other employees because of his gender is a question of material fact for the jury to decide.

■ Defendants also argue that Bistodeau never made a sexual advance toward Waag. In their view, no reasonable juror could conclude that Bistodeau's conduct at the tent sale, even when considered in context with Bistodeau's prior conduct, constituted an unwelcome sexual advance. We disagree. In considering these claims, "the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406 (citing and approving EEOC Guidelines). Furthermore, questions such these often turn on credibility determinations committed to the trier of fact. *See Id.* at 68, 106 S.Ct. at 2406. While Bistodeau's statement, "You know what you can do if you want a bigger bid," standing alone, would be insufficient as a matter of law to constitute an actionable *quid pro quo* claim, we cannot conclude such is the case when the statement is considered in the context of Bistodeau's prior conduct. Before the al-

leged *quid pro quo* incident at the tent sale, Bistodeau had allegedly sexually harassed Waag on several occasions. Moreover, Bistodeau himself indicated that bigger bids can translate into higher commissions for salespersons. Bistodeau Depo. at 75–6. For these reasons, we feel that this issue is also one for the jury to decide.

Defendants also contend that Plaintiff has not shown how his refusal to accept Bistodeau's alleged *quid pro quo* offer at the tent sale deprived him of any job benefit or resulted in any job detriment. Waag, however, has alleged that if Bistodeau had offered him a higher bid on the used-car trade-in, he would have earned a higher commission. *See* Amended Complaint ¶ 14(f). During his deposition, Bistodeau himself substantiates this allegation in the following exchange:

Q. How does [the bid] affect the salesman, whether its bigger or not?

A. Well, it's easier for them to make a deal or whatever. It could mean a higher gross.

. . . . .

Q. But if we change the bid on a sale, it can affect the salesperson's commission, right?

A. Yes, it can.

Q. And is it fair to say that the salesperson frequently wants a bigger bid?

A. That would be obvious.

Q. And if they want a bigger bid, it's because it affects their pocketbook, right?

A. Right.

Bistodeau Depo. at 75–6. In light of the above, we cannot say that no reasonable juror could conclude that Bistodeau denied Waag tangible job benefit by offering him lower bid on a trade-in.

Finally, Defendants argue that Plaintiff has adduced no evidence tending to suggest that Bistodeau is a homosexual. Defendants claim that Bistodeau's statement, "I like women. I don't like guys," is dispositive on this issue. According to Defendants, Plaintiff must adduce specific, *admissible* facts demonstrating Bistodeau's sexual orientation. In *Celotex,* however, the Supreme Court

made it clear that the nonmoving party need not rely on admissible evidence in defending against a motion for summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Here, Waag has asserted that most of the employees that he worked with told him that Bistodeau was gay. (Waag Depo. at 50.) In addition, Waag contends that Brian Taylor, a former General Sales Manager at Thomas Pontiac, confirmed what the other employees had told him regarding Bistodeau's sexual orientation. (*Id.* at 51, 106.) Waag also claims that another person in the automobile industry approached him, after hearing about Waag's alleged problems with Bistodeau, and told him that Bistodeau was a homosexual. (*Id.* at 52.) Finally, Plaintiff has submitted the affidavit of A.R. Monsrud, another employee of Thomas Pontiac, who claims that several salespersons told him that Bistodeau himself told them that he was a homosexual. (Monsrud Aff. ¶ 5, attached as Ex. B to Smith Aff.) Although this hearsay evidence may not be admissible at trial, we may consider it for purposes of deciding this motion. In doing so, we conclude that when considered in the context of Bistodeau's alleged conduct and his deposition testimony, these statements raise the possibility that reasonable minds could differ as to Bistodeau's sexual orientation. For all of the foregoing reasons, we decline to grant Defendants motion for summary judgment on these grounds.

### C. *Employer Liability under Respondeat Superior*

 Thomas Pontiac argues that even if Bistodeau's conduct is actionable, it is not liable under Title VII because it did not know about the harassment. According to Thomas Pontiac, Waag's discussion with Mark Morris, a Vice–President, amounted to no more that a venting of his homophobia. Plaintiff, however, contends that Thomas Pontiac is strictly liable under Title VII for any *quid pro quo* harassment perpetrated by Bistodeau, the General Sales Manager at Thomas Pontiac. We agree with Plaintiff.

A number of courts, including the Eighth Circuit, have held that employers are strictly liable for the actions of its supervisors that amount to sexual harassment resulting in tangible job detriment to the subordinate employee. *Crimm v. Missouri Pacific R.R Co.,* 750 F.2d 703, 710 (8th Cir.1984) (citing *Katz v. Dole,* 709 F.2d 251, 255 n. 6 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934, 943 (D.C.Cir.1981); *Miller v. Bank of Am.,* 600 F.2d 211, 213 (9th Cir.1979)). In the instant case, Bistodeau directly supervised Plaintiff, who was a salesman. Thus, if Plaintiff prevails on his *quid pro quo* claim, Defendant Thomas Pontiac will be held strictly liable.

 With respect to the hostile environment claim, Plaintiff contends Thomas Pontiac is liable for Bistodeau's conduct if it knew or should have known about the harassment. According to Plaintiff, this is also an issue for the jury to decide given what Waag allegedly told Mark Morris, a vice-president at Thomas Pontiac. Again we agree with Plaintiff. For purposes of Title VII, an employer is liable for sexual harassment if it "knew or should have known of the harassment and failed to take proper remedial action." *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1327 (8th Cir.1994) (quoting *Davis v. Tri–State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992) (quoting *Burns v. McGregor Electronic Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992)). In *Stacks,* the court imputed liability to the company because several managers had actual knowledge of the alleged harassment. *Id.* Here, Waag has alleged that he told Morris, Thomas Pontiac's Vice–President, that he thought Bistodeau was a homosexual, that Bistodeau repeatedly touched him and other members of the sales staff, and that he wanted the touching to stop. Morris allegedly responded to Waag's complaint by laughing. (Id.). Thomas Pontiac apparently did not investigate Waag's complaint. Waag also claims he told several other employees of the alleged harassment by Bistodeau.[11] Whether Plain-

---

11. In light of our holding that Thomas Pontiac is strictly liable for any *quid pro quo* harassment, we need not address Thomas Pontiac's argument that it is not liable for any *quid pro quo* claim because Plaintiff did not specifically complain to

tiff merely vented his alleged homophobia to Morris, as Defendants contend, or sufficiently informed him of the alleged harassment is a question of fact for the jury to decide. Suffice it to say that if the jury finds that Morris, a vice-president of the company, had actual knowledge of the harassment, such knowledge should be imputed to Thomas Pontiac. For this reason, we decline to grant Defendant Thomas Pontiac's motion for summary judgment on this ground.

### D. Constructive Discharge

■ Defendants contend that Plaintiff did not allege facts showing that he was "constructively discharged" from his employment at Thomas Pontiac. We disagree. In order to establish that he was constructively discharged, Plaintiff must show: 1) he resigned; 2) he resigned because of intolerable working conditions; 3) the intolerable working conditions resulted from illegal discrimination; 4) a reasonable person would have found the conditions intolerable; and 5) the employer intended to force the employee to quit, or the employee's resignation was a reasonably foreseeable consequence of the employer's actions. See Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101, 3 F.3d 281, 285 (8th Cir.1993). Here, we cannot say, as a matter of law, that Defendants' conduct, if proven, would fall short of meeting the reasonable person standard for intolerable working conditions. Plaintiff has alleged that he was sexually harassed by Bistodeau on a number of occasions in a short period of time. Furthermore, Plaintiff has alleged that he complained to a vice-president of the company about the alleged harassment and that the company did nothing in response. Thomas Pontiac has not alleged that it undertook any investigation after Waag complained. Given these allegations, it is for the jury to decide whether a reasonable person would have felt compelled to resign.

Defendants also contend that there was no constructive discharge because Bistodeau did not act with the intent to make Waag quit. Consistent with Hukkanen, Defendants' brief acknowledges that Plaintiff can meet this prong of the constructive discharge test by showing that his resignation was a reasonably foreseeable consequence of the Bistodeau's actions. Again, in view of Plaintiff's allegations regarding Bistodeau's conduct and Thomas Pontiac's lack of response, we cannot say that no reasonable juror could find that Waag's resignation was foreseeable. For this reason, the jury must decide this issue. Finally, Defendants contend that the intolerable working conditions were not the result of illegal discrimination. In light of our holding that same-gender sexual harassment claims are actionable under both Title VII and the MHRA, however, this argument will fail if the claims are proven at trial. For these reasons, we decline to grant Defendants' motion for summary judgment on this claim.

### E. Employee's Individual Liability under Title VII

■ We now turn to Bistodeau's argument that supervisors cannot be held personally liable for sexual harassment under Title VII or the MHRA.[12] As threshold matter, we consider Plaintiff's "law of the case" argument. According to Plaintiff, a prior state district court ruling on this issue precludes this Court from reconsidering it under the doctrine of "law of the case." We disagree. Although the Anoka County District Court did rule in favor of the Plaintiff on this issue when it considered whether to allow Plaintiff to amend his complaint to add a Title VII claim, see Order and Memo., Judge Gibbs at 6, attached as Ex. I to Smith Aff., the "law of the case" doctrine does not bar us from reconsidering the matter. While the "law of the case" generally prevents relitigation of an issue previously decided in the same case, the doctrine need not be followed when a claim based on a federal question is removed to federal court. See Local 1 of

Morris about the alleged *quid pro quo* harassment.

**12.** Because Minnesota courts have yet to consider whether supervisors can be held personally liable under the MHRA, we construe the MHRA as offering protection analogous to that provided by Title VII. *See supra* note 3.

*United Food & Commercial Workers v. Heinrich Motors, Inc.,* 559 F.Supp. 192, 195 (W.D.N.Y.1983) (citing 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* § 404(b) at 504). Indeed, a federal court may even reopen an issue of state law after removal if it is satisfied that the state court erred as a matter of law. *Remington v. Central Pac. R.R. Co.,* 198 U.S. 95, 99–100, 25 S.Ct. 577, 579, 49 L.Ed. 959 (1905) (Holmes, J.). Where the state court has erred, the policies behind the "law of the case," conserving judicial resources and respecting finality of decisions, must give way. Because we believe that the state court erred in holding individuals may be personally liable under Title VII, we decline to invoke the doctrine of "law of the case."

According to Defendants, the Eighth Circuit all but ruled conclusively on this issue in *Lenhardt v. Basic Inst. of Tech., Inc.,* 55 F.3d 377 (8th Cir.1995). We agree. In *Lenhardt,* the court was faced with determining whether supervisors and managers could be held personally liable under the Missouri Human Rights Act (MSHRA). *Id.* at 378. The Missouri Supreme Court, however, had not yet addressed this issue. *Id.* at 379. Noting the Missouri Supreme Court had considered analogous federal civil rights laws in deciding issues under the MSHRA, the court looked to analogous federal law under Title VII for guidance.[13] *Id.* at 380. After canvassing federal caselaw, the Court concluded that the Missouri Supreme Court would "hold that the definition of the term employer in the M[S]HRA does not subject employees, including supervisors or managers, to individual liability." *Id.* at 381. In so concluding, the court noted "[e]very circuit that has considered the issue ultimately concluded that an employee, even one possessing supervisory authority, is not an employer upon whom liability can be imposed under Title VII." *Id.*

While we agree with Plaintiff's contention that *Lenhardt* did not conclusively resolve the issue under Title VII, we see no reason to believe that the court of appeals would treat an identical Title VII case differently. Although not unanimous, a large majority of the circuit courts addressing this issue have concluded that supervisors do not fall within the definition of "employer" under Title VII.[14] *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995) (holding an employer's agent may not be held individually liable under Title VII); *Sheridan v. E.I. DuPont de Nemours and Co.,* 74 F.3d 1439, 1454 (3rd Cir.1996) (holding that supervisor cannot be sued in individual capacity under Title VII); *Grant v. Lone Star Co.,* 21 F.3d 649, 653 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994) (same); *Williams v. Banning,* 72 F.3d 552, 555 (7th Cir.1995) (holding that a supervisor does not, in his individual capacity, fall within Title VII's definition of employer); *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587 (9th Cir. 1993), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994) (same); *Cross v. State of Alabama,* 49 F.3d 1490, 1504 (11th Cir.1995) (holding that employees cannot be personally liable under Title VII); *Gary v. Long,* 59 F.3d 1391, 1399 (D.C.Cir.) (same), *cert. denied,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). *But see Ball v. Renner,* 54 F.3d 664, 667 (10th Cir.1995) (implying that employee with employer-like authority may be held individually liable under Title VII); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989) (holding that employee in supervisory position with significant control over hiring, firing or conditions of employment can be held personally liable under Title VII); *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986) (implying that agents of the employer cab be held personally liable under Title VII). In view of the Eighth Circuit's decision in *Lenhardt* and the great weight of authority, we decline to adopt the minority position and now hold

---

**13.** The court concluded that the statutory definitions of "employer" under the MSHRA and Title VII were analogous for purposes of deciding whether supervisors could beheld personally liable. *Lenhardt,* 55 F.3d at 380.

**14.** Under Title VII, "employer" is defined as "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).

that Defendant Bistodeau cannot be held individually liable under Title VII and the MHRA.

### F. Assault and Battery Claims

 Defendants argue that Plaintiff has not alleged facts sufficient for a prima facie case of assault. Under Minnesota law, an assault is "an unlawful threat to do bodily harm to another with the present ability to carry the threat into effect." *Dahlin v. Fraser*, 206 Minn. 476, 288 N.W. 851, 852 (1939). Mere words or threats are insufficient; the "display of force must be such as to cause plaintiff reasonable apprehension of immediate bodily harm." *Id.* Here, Plaintiff has not alleged facts indicating that Bistodeau's conduct at the tent sale caused Plaintiff to have "a reasonable apprehension of immediate bodily harm." Even when viewed in the most favorable light, we believe that no reasonable juror could conclude that Waag's alleged apprehension of fear was reasonable when Bistodeau allegedly yelled, "Come on. Let's take a ride and I'll show you what life's about." Without more, Plaintiff's bare allegation that he "was in fear that one day when he yelled at me" is insufficient.[15] For this reason, we grant Defendants' motion for summary judgment with respect to Plaintiff's assault claim.

 In addition, Defendant Thomas Pontiac contends that it is not vicariously liable for Bistodeau's torts because Plaintiff did not allege such liability in the either the original or amended complaint. We agree. Count III (Assault and Battery) of the amended complaint alleges only that "Defendant Bistodeau committed assault and battery upon Plaintiff." *See* Second Amended Complaint ¶ 33. The complaint does not, however, allege that Defendant Thomas Pontiac is vicar-

iously liable for Bistodeau's alleged torts. In our view, Plaintiff has failed to give Defendant Thomas Pontiac sufficient notice of its intent to hold them liable under the doctrine of respondeat superior. For this reason, we grant Defendant Thomas Pontiac's motion for summary judgment with respect to the remaining battery claim.[16]

### G. After–Acquired Evidence Doctrine

 Finally, Defendants argue that Plaintiff's damages should be limited under the doctrine of after-acquired evidence because Plaintiff falsified his job application upon applying at Thomas Pontiac. If invoked, the after-acquired evidence doctrine operates to limit the remedies available to a Title VII plaintiff. *McKennon v. Nashville Banner Pub. Co.*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). In order to invoke the doctrine, the employer must establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it." *Id.* at —— ——, 115 S.Ct. at 886–87. In making such a showing, the employer bears a "substantial burden" and must show that such a firing would have taken place as a matter of "settled" company policy. *See Welch v. Liberty Mach. Works, Inc.*, 23 F.3d 1403, 1406 (8th Cir.1994).

In *Welch*, the employer had the burden of showing that it would not have hired the plaintiff-employee had it known about a subsequently discovered misrepresentation on plaintiff's job application.[17] *Id.* at 1405. In support of its motion for summary judgment, the employer attached a single affidavit of the company's president stating "[the company] would never have hired Welch [the plaintiff] had disclosed to [the company] that his most recent employer . . . had just fired him

---

15. Significantly, the gravamen of Plaintiff's *quid pro quo* Title VII claim is that Bistodeau's statement, "Come on. Let's take a ride and I'll show you what life's about," constituted part an alleged request for sexual favors.

16. Alternatively, we grant Defendant Thomas Pontiac's motion for summary judgment with respect to Plaintiff's assault claim on the same ground.

17. Although *McKennon* overruled *Welch* with respect to its holding that the after-acquired evidence doctrine would bar *any* recovery under Title VII if the employer could show that it would not have *hired* the plaintiff-employee had it known of a subsequently discovered misrepresentation on the plaintiff's job application, we believe the Court's discussion concerning the employer's burden of production in the context of summary judgment under the after-acquired evidence doctrine is still good law.

after only one month because they were not satisfied" with his work. *Id.* at 1404. In rejecting the employer's motion, the court asserted that "by itself ... [the] affidavit is a self-serving document and does not establish the material fact that" the company would not have hired the plaintiff had it known of the misrepresentation. *Id.* at 1406. The court cautioned, however, that an undisputed employer affidavit may, "in some circumstances," establish the requisite material fact of the employer's settled policy. *Welch,* 23 F.3d at 1406. We do not believe, however, that this is such a case.

Here, as in *Welch,* Defendants have submitted a single affidavit asserting that the company would have fired Plaintiff upon discovery that he had been terminated from his previous employment after being convicted of the crime of conspiracy to commit auto theft. (Morris Aff.) Defendants, however, have not offered sufficient evidence suggesting that this is a matter of settled policy. Indeed, in at least one instance where Thomas Pontiac discovered that an employee had been indicted for embezzling from a prior employer, it merely "considered ... [her] terminable." (*Id.* at ¶ 5.) According to Thomas Pontiac, the employee resigned instead of facing involuntary termination. (*Id.*) That Thomas Pontiac did not immediately terminate her appears inconsistent with Morris's contention that he would have discharged Waag "immediately." (*Id.*) Furthermore, Plaintiff has brought forth evidence which tends to rebut Defendants' contention. According to Brian Taylor, a former General Sales Manager at Thomas Pontiac, the company would have hired Plaintiff even if it had known about the criminal conviction. (Taylor Aff., attached as Ex. C to Smith Aff.) While we recognize that whether Defendants would have *hired* Plaintiff is not the precise issue here, Taylor's statement casts some doubt upon Morris' contention that the company would have fired him. Significantly, unlike Morris, Taylor does not appear to have any vested interest in the outcome of this litigation. Finally, we note that upon learning of Plaintiff's resignation, Morris said, "I would like you to stay ... I think your [sic] a real good salesperson." (Statement of Mark Morris, attached as Ex. J to Damon Aff.) Although

Morris made this statement before acquiring knowledge that Plaintiff omitted his criminal conviction, it suggests that Thomas Pontiac may not have readily terminated Waag upon discovering his fraud. In sum, all of these factors compel us to conclude that the jury must decide whether Thomas Pontiac would have "in fact' terminated Plaintiff upon discovering that he falsified his job application by omitting his criminal conviction.

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment with respect to the Title VII and MHRA sexual harassment claims is **DENIED;**

2. Defendant Thomas Pontiac's motion for summary judgment with respect to employer liability under Title VII and the MHRA is **DENIED;**

3. Defendant Bistodeau's motion for summary judgment with respect to personal liability under Title VII and the MHRA is **GRANTED;**

4. Defendants' motion for summary judgment with respect to the constructive discharge claim is **DENIED;**

5. Defendants' motion for summary judgment with respect to Plaintiff's assault claim is **GRANTED;**

6. Defendant Thomas Pontiac's motion for summary judgment with respect to employer liability for Defendant Bistodeau's torts is **GRANTED;**

7. Defendants' motion for summary judgment with respect to limiting damages on the basis of after-acquired evidence is **DENIED.**