[No. B114877. Second Dist., Div. One. June 30, 1998.]

ISELA MURILLO, Plaintiff and Appellant, v.
RITE STUFF FOODS, INC., Defendant and Respondent.

## COUNSEL

Eli Estrada, Barboza & Associates, Carla D. Barboza and Maria Hanna Joseph for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy, Andrea M. Gauthier, Jones, Hirch, Connors & Bull and Alan G. Saler for Defendant and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Plaintiff Isela Murillo appeals from a summary judgment entered in favor of defendant Rite Stuff Foods, Inc. We reverse the judgment.

### PROCEDURAL AND FACTUAL BACKGROUND[1]

On January 3, 1996, plaintiff sued defendant and its agents for sexual harassment, wrongful termination, breach of contract and the contractual

---

[1]More detailed facts will appear in the body of the opinion as they are necessary to a discussion of the issues.

covenant of good faith and fair dealing, general negligence, negligent supervision and retention of an employee, invasion of privacy, assault, battery, false imprisonment and the intentional and negligent infliction of emotional distress. Plaintiff's claims arose from her three-month employment with defendant. She commenced her employment as an assembler on February 6, 1995.

Throughout her employment, plaintiff alleges, her immediate supervisor, Efren Atilano (Atilano), touched her inappropriately and made crude sexual propositions and lewd remarks to her. He isolated her from other employees to facilitate his predations. He insulted her in front of her coworkers. Atilano engaged in all of this conduct against plaintiff's will.

On two separate occasions, plaintiff complained of Atilano's conduct to Jose Orlando Tobar (Tobar), the plant manager. Tobar assured her that he would take care of the matter. Defendant did nothing to investigate or remediate the situation, however. Instead, on May 4, 1995, defendant suspended her for one week. Thereafter, on May 15, defendant terminated her employment.

During discovery, defendant took plaintiff's deposition. She acknowledged that she was an undocumented alien. At the suggestion of Atilano, she had gone to Alvarado Street between Seventh and Eighth Streets and had purchased false resident alien and Social Security cards. She used these documents to secure her employment.

Upon learning these facts, defendant moved for summary judgment, asserting plaintiff's claims were barred by the doctrine of after-acquired evidence. Plaintiff promptly dismissed those causes of action and her claims related to her discharge.

According to defendant's president, Thomas T. Madden (Madden), defendant would not have hired plaintiff had it known of her illegal status when she applied for employment. Had defendant learned of her status after she was employed, it would have fired her immediately. According to Tobar, it was company policy that every worker have government authorization to work in this country.

In opposition to the motion for summary judgment, plaintiff relied on her own deposition testimony that Atilano knew she was undocumented yet told her how and where to obtain false documents and to use these documents to secure employment with defendant. She also relied on the deposition testimony of Claudia Valadez (Valadez), one of defendant's employees.

According to Valadez, who worked under the immediate supervision of Larry Bates (Bates), defendant's general manager, defendant knew its workers were undocumented but took no steps to discharge them. When Valadez was filling out forms for an insurance company, she checked employees' resident alien cards. She told Bates the company was employing mostly undocumented aliens. She could tell that the documents they had submitted were false. She told Bates the employees went to Huntington Park to obtain false documents.

Valadez talked to Bates about this more than once. On one occasion, Bates responded that the undocumented employees got their resident alien cards in Tijuana. Madden commented once that most of his employees were undocumented.

## CONTENTION

Plaintiff contends the trial court erred in granting summary judgment on the ground that the after-acquired-evidence doctrine bars all of her claims. For the reasons set forth below, we agree.

## DISCUSSION

■ Summary judgment properly is granted if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Mars* v. *Wedbush Morgan Securities, Inc.* (1991) 231 Cal.App.3d 1608, 1613 [283 Cal.Rptr. 238].) To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action (*Albert* v. *Southern Pacific Transportation Co.* (1994) 30 Cal.App.4th 529, 533 [35 Cal.Rptr.2d 777]; *Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674]) or show that an element of the cause of action cannot be established (*Gribin Von Dyl & Associates, Inc.* v. *Kovalsky* (1986) 185 Cal.App.3d 653, 663 [230 Cal.Rptr. 50]). (Code Civ. Proc., § 437c, subd. (o)(2); see *Hanooka* v. *Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70].) The defendant "must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial." (*Chevron U.S.A., Inc., supra,* at p. 548.)

Inasmuch as summary judgment is a drastic procedure and should be used with caution (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]), the moving party's papers are strictly construed, while the opposing party's papers are liberally construed (*Brantley* v. *Pisaro*

(1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431]; *Pekarek* v. *City of San Diego* (1994) 30 Cal.App.4th 909, 912 [36 Cal.Rptr.2d 22]). Notwithstanding the strict construction given the moving party's evidence and the liberal construction given to that of the opposing party, the opponent has the burden of showing triable issues of material fact do exist; he or she may not rely on the pleadings. (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 596 [125 Cal.Rptr. 557, 542 P.2d 981]; *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 668 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].)

The court must consider presumptions and draw inferences from the facts adduced where the inference is the only reasonable one which may be drawn. (See *Unjian* v. *Berman* (1989) 208 Cal.App.3d 881, 884 [256 Cal.Rptr. 478], review den. May 23, 1989; *Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 441 [165 Cal.Rptr. 741]; *Hirsch* v. *Blish* (1977) 76 Cal.App.3d 163, 166 [142 Cal.Rptr. 646].) The court has no power in a summary proceeding to weigh one inference against another or against other evidence, however. (*Unjian, supra,* at p. 884; *Brown* v. *City of Fremont* (1977) 75 Cal.App.3d 141, 145 [142 Cal.Rptr. 46].) On appeal, we review the matter de novo. (*Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653]; *Torres* v. *Cool Carriers A.B.* (1994) 26 Cal.App.4th 900, 904 [31 Cal.Rptr.2d 790].)

It is important to note initially what is *not* at issue in this appeal. In moving for summary judgment, defendant relied solely on the after-acquired-evidence doctrine. It submitted six facts pertaining to that defense which it considered to be undisputed. Defendant did not seek to adjudicate summarily any other issue, however. Accordingly, we are not concerned with any of the evidentiary issues underpinning plaintiff's claims.

Plaintiff sued defendant and some of its employees for sexual harassment in violation of title VII of the Civil Rights Act of 1964 and the Fair Employment and Housing Act (FEHA), wrongful termination in violation of public policy and breach of the employment contract. She also sued for intrusive invasion of privacy, negligent supervision of an employee, negligent retention of an employee, assault, battery, false imprisonment, intentional and negligent infliction of emotional distress and general negligence. She later dismissed her wrongful termination, contract and wage-related claims.

Both title VII (42 U.S.C. § 2000a et seq.) and the FEHA (Gov. Code, § 12900 et seq.) prohibit sexual harassment in the workplace. (42 U.S.C. § 2000e et seq.; Gov. Code, § 12940, subd. (h); *Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49].) In enacting

the FEHA, the Legislature declared in Government Code section 12921 that " 'the opportunity to be free from discriminatory practices in seeking, obtaining, and holding employment is a "civil right." ' " (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 605 [262 Cal.Rptr. 842].)

■ The FEHA offers greater protection and relief to employees than does title VII. An employer is strictly liable for damages an employee incurs as a result of a supervisor's or agent's sexual harassment. (Gov. Code, § 12940, subd. (h)(1); *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1328 [58 Cal.Rptr.2d 308]; *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 415 [27 Cal.Rptr.2d 457].) Moreover, the courts may award unlimited compensatory and punitive damages. (Gov. Code, § 12965, subd. (c)(3); *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 215 [185 Cal.Rptr. 270, 649 P.2d 912].)

■ The after-acquired-evidence doctrine serves as a complete or partial defense to an employee's claim of wrongful discharge. It comes into play when, after an employee's termination, the employer learns of employee wrongdoing that would have resulted in the employee's discharge in any event. (*Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 632 [41 Cal.Rptr.2d 329], review den. Aug. 17, 1995.)

In *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352 [115 S.Ct. 879, 130 L.Ed.2d 852], the Supreme Court considered the scope of the after-acquired-evidence doctrine in discrimination-related wrongful discharge claims. The court noted that, while employee misconduct may be a supervening cause for termination, inquiry into whether the employer discriminated against the employee does not thereby necessarily become irrelevant. (*Id.* at pp. 356-357 [115 S.Ct. at p. 883].) This is so because antidiscrimination statutes serve a broad public purpose—"to eradicate discrimination in the workplace." (*Id.* at p. 357 [115 S.Ct. at at p. 884].) Such statutes "reflect[] a societal condemnation of invidious bias in employment decisions." (*Ibid.*)

Given the broad public purpose of the antidiscrimination statutes, their remedial measures are "designed . . . to serve as a 'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination. [Citations.] Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another. [Citations.]" (*McKennon v. Nashville Banner Publishing Co., supra,* 513 U.S. at p. 358 [115 S.Ct. at p. 884].) Permitting an injured employee to recover damages and other available relief "vindicates both the deterrence and the

compensation objectives" of an antidiscrimination statute. (*Ibid.*) "It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation" of an antidiscrimination statute. (*Ibid.*)

In reaching this conclusion, the court found value in employee litigation itself. "The disclosure through litigation of incidents or practices which, violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands . . . ." (*McKennon* v. *Nashville Banner Publishing Co., supra,* 513 U.S. at pp. 358-359 [115 S.Ct. at p. 885].)

Moreover, the court concluded, the unclean hands doctrine did not mandate a different result. That doctrine does not apply "where Congress authorizes broad equitable relief to serve important national policies. We have rejected the unclean hands defense 'where a private suit serves important public purposes.' [Citation.]" (*McKennon* v. *Nashville Banner Publishing Co., supra,* 513 U.S. at p. 360 [115 S.Ct. at p. 885].) Nonetheless, the court acknowledged, the employee's wrongdoing must be taken into account "lest the employer's legitimate concerns be ignored." (*Id.* at p. 361 [115 S.Ct. at p. 886].) The conduct is relevant "to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (*Ibid.*) These considerations will vary from case to case.

In the case before it, the Supreme Court held, the employee's wrongdoing would limit the remedies available, eliminating the right to recover future pay and to gain reinstatement. (*McKennon* v. *Nashville Banner Publishing Co., supra,* 513 U.S. at pp. 361-362 [115 S.Ct. at at pp. 886-887].) The wrongdoing would not bar all relief, however. An absolute bar "would undermine the [antidiscrimination statutes'] objective of forcing employers to consider and examine their motivations, and of penalizing them for [discriminatory] employment decisions [or actions]." (*Id.* at p. 362 [115 S.Ct. at p. 886]; see also *Mardell* v. *Harleysville Life Ins. Co.* (3d Cir. 1994) 31 F.3d 1221, 1236-1237, revd. and remanded, opn. reinstated at 65 F.3d 1072; *Cooper* v. *Rykoff-Sexton, Inc.* (1994) 24 Cal.App.4th 614, 618-619 [29 Cal.Rptr.2d 642].)

In *Camp* v. *Jeffer, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th 620, this court applied the after-acquired-evidence doctrine to wrongful discharge claims which also included one claim under the FEHA. When the plaintiffs applied for employment with a law firm, they failed to reveal that

they had been convicted of felonies and positively misrepresented that they had not been so convicted. (At p. 626.) The law firm later acquired a contract with the Resolution Trust Corporation (RTC).

Because federal law requires that the RTC not contract with anyone hiring a person convicted of a felony, the plaintiffs' "misrepresentations about their felony convictions went to the heart of their employment relationship with [the defendant]. . . . [The plaintiffs'] misrepresentations placed [the defendant] in the risky position of certifying to the federal government—inaccurately—that all of the firm's employees met the RTC's qualifications. [They] thus put [the defendant] not only in jeopardy of losing its contract with the RTC but also of being accused of making false statements itself." (*Camp* v. *Jeffer, Mangels, Butler & Marmaro, supra*, 35 Cal.App.4th at p. 637.)

We focused in *Camp* solely on *McKennon's* recognition that "the use of after-acquired evidence must 'take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing.' [Citation.]" (*Camp* v. *Jeffers, Mangels, Butler & Marmaro, supra*, 35 Cal.App.4th at pp. 637-638.) We concluded that the equities favor the employer "where an employee who is disqualified from employment by government-imposed requirements nevertheless obtains a job by misrepresenting the pertinent qualifications. In such a situation, the employee should have no recourse for an alleged wrongful termination of employment. As stated by another court, 'The present case is akin to the hypothetical wherein a company doctor is fired [for improper reasons] and the company, in defending a civil rights action, thereafter discovers that the discharged employee was not a "doctor." In our view, the masquerading doctor would be entitled to no relief . . . .' [Citation.]" (*Id.* at p. 638, fn. omitted.)

We then proceeded in *Camp* to apply the doctrine of unclean hands to plaintiffs' claims. ▮ That doctrine, of course, "rests on the maxim that 'he who comes into equity must come with clean hands.' [Citation.] ' "This maxim is far more than a mere banality. It . . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." ' [Citation.] In California, the doctrine of unclean hands may apply to legal as well as equitable claims [citations]. . . . [¶] . . . '[I]t is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct . . . must relate directly to the transaction concerning which complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. Accordingly, relief is not denied because the plaintiff may have

acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court.' [Citation.]" (*Camp* v. *Jeffers, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th at pp. 638-639, fn. omitted.)

We ultimately held in *Camp* that the plaintiffs' misrepresentations about their felony convictions "relate directly to [the] wrongful termination claims. Since [the plaintiffs] were not lawfully qualified for their jobs, they cannot be heard to complain that they improperly lost them." (*Camp* v. *Jeffers, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th at p. 639.) We also barred the husband plaintiff's discrimination claim, which alleged he was fired because he was married to his wife whom defendant had fired earlier, purportedly in retaliation for reporting a firm member's insider trading. (*Ibid.*) In barring the discrimination claim, we noted that the husband still could report alleged wrongdoing to the appropriate authorities.

 In dismissing her wrongful discharge claims, plaintiff conceded that the facts of this case would support application of at least the unclean hands doctrine to bar them. It is undisputed that plaintiff obtained false resident alien and Social Security cards, then used them to obtain her employment with defendant. In so doing, she misrepresented that she was a resident alien entitled to work in this country.

The Immigration Reform and Control Act of 1986 (IRCA) prohibits employers from knowingly hiring or continuing to employ unauthorized aliens. (8 U.S.C. § 1324a(a), (e), (f).) That an employee be a citizen or resident alien authorized to work thus is a government-imposed employment qualification.

As required by law, defendant submitted an I-9 form on behalf of plaintiff when it hired her. The form attested under penalty of perjury that the documents submitted on behalf of the employee appeared to be genuine and that, to the best of the employer's knowledge, the employee is eligible to work in the United States. (8 U.S.C. § 1324a(b).) Plaintiff's misrepresentation therefore created a risk that defendant could be sanctioned not only for knowingly employing an undocumented alien but for submitting a perjurious I-9 form. These are potential consequences of great seriousness for the employer.

Plaintiff's misrepresentation went to the heart of the employment relationship and related directly to her wrongful discharge and contractual claims. The unclean hands doctrine therefore would bar those claims. (*Camp* v. *Jeffers, Mangels, Butler & Marmaro, supra,* 35 Cal.App.4th at pp. 638-639.)

The analysis is somewhat different with respect to application of the after-acquired-evidence doctrine. To invoke this doctrine, ". . . the

employer must establish 'that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it.' [Citation.] . . . [T]he employer . . . must show that such a firing would have taken place as a matter of 'settled' company policy. [Citation.]" (*Waag* v. *Thomas Pontiac Buick, GMC, Inc.* (D.Minn. 1996) 930 F.Supp. 393, 408.)

■ Defendant submitted a declaration from its president, Madden, stating it would not have hired plaintiff had it known of her illegal status when she applied for employment. Had defendant learned of her status after she was employed, it would have fired her immediately. According to Tobar, the plant manager, it was company policy that every worker have government authorization to work in this country.

According to Valadez, another of defendant's employees, however, defendant knew of the undocumented status of its workers and took no steps to discharge them. When Valadez was filling out forms for an insurance company, she checked employees' resident alien cards. She could tell that the documents they had submitted were false. She told Bates, her immediate supervisor and the company's general manager, that the company was employing mostly undocumented aliens. She told him they went to Huntington Park to obtain false documents. When questioned during her deposition, Valadez was able to name several employees she knew to be undocumented.

Valadez talked to Bates about this more than once. On one occasion, Bates responded that the undocumented employees got their resident alien cards in Tijuana. Moreover, Madden once commented that most of his employees were undocumented aliens. Finally, according to plaintiff, Atilano, who would become both her immediate supervisor and her alleged harasser, told her to obtain false documents. He told her to go to Alvarado Street between Eighth and Ninth and purchase them, then to use them to obtain employment with defendant.

While this evidence does not establish that defendant's officers or agents knew plaintiff or any other particular employee was in fact an undocumented alien, it is enough to raise a question as to whether defendant actually would have refused to hire or fired plaintiff immediately upon learning of her undocumented status. When considered with Valadez's testimony, plaintiff's testimony would support an inference that defendant tacitly condoned the hiring of undocumented aliens as long as they presented false documentation.

Of course, Madden and Bates may have believed Valadez was joking and responded with like banter. Conversely, they may have known Valadez was

serious because they themselves had spotted the false resident alien cards and other documentation. In the latter case, they may have believed they were foreclosed from investigating the status of alien workers but indeed would have acted promptly to remove one who admitted undocumented status. These are all factual questions, however, which cannot be resolved on summary judgment.

In short, given plaintiff's and Valadez's testimony, defendant has failed to establish as a matter of law that, as a matter of settled company policy, it would have fired plaintiff immediately upon learning of her undocumented status. (*Waag* v. *Thomas Pontiac, Buick, GMC, Inc.*, *supra*, 930 F.Supp. at p. 408.) Defendant therefore has failed to establish that the after-acquired-evidence doctrine would bar plaintiff's claims.

██ In any event, there is no sound reason why either the after-acquired-evidence doctrine or the unclean hands doctrine should bar plaintiff's discrimination or tort claims. In contrast to the husband plaintiff in *Camp*, whose discrimination claim arose from his discharge, plaintiff's discrimination and tort claims arise from acts occurring during her employment.

She alleges that throughout her three months of employment, Atilano "repeatedly invited [her] out on dates with him, and insisted on questioning [her] regarding private sexual matters such as her sexual practices and sexual preferences and made comments to [her] about his preference concerning her garments and undergarments." In addition, Atilano "regularly proposition[ed] [her] to go to Triple 'X' rated movies with him to get her 'hot and horny' so that she would immediately want to take her panties off without waiting for [him] to take them off." He placed his hands on plaintiff's back "while making sexually suggestive remarks, knowing that [she] found such conduct to be offensive." Atilano "would grab, hug and attempt to kiss [her] without her consent"; he would "place his hands on [her] breasts and buttocks while making sexually suggestive remarks." On one occasion, Atilano told plaintiff "he wished [she] would have a baby so that [he] could breast feed from her."

Atilano also insulted her in front of other employees. He would make remarks like "You're not that good," "You can't say you don't like it" and " 'All women want the '69.' " On one occasion, he told her he wanted "to 'get on top of her and "do it" "tiger style." ' " He also referred to her as a " 'good blanket' that he would like to cover himself with."

Atilano isolated plaintiff from other employees in order to facilitate his actions. When other male employees talked to plaintiff, he became angry and told them she was his " 'piece of meat.' "

■ As noted in *Kelly-Zurian* v. *Wohl Shoe Co.*, *supra*, 22 Cal.App.4th at page 409, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is ' "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," ' the law is violated. [Citation.]" (Accord, *Matthews* v. *Superior Court* (1995) 34 Cal.App.4th 598, 605 [40 Cal.Rptr.2d 350].) That is, once discriminatory conduct in the form of sexual harassment meets this requirement, the wrong and the injury occasioned by it are complete even though the plaintiff does not lose any tangible job benefit. (Gov. Code, § 12940, subd. (h).)

■ In short, the plaintiff need not resign or be discharged to have a cause of action for sexual harassment. Plaintiff therefore need not hitch her sexual harassment wagon to the wrongful discharge star.

The acts plaintiff alleges meet the *Kelly-Zurian* test. She also alleges injury during this period: She lost confidence and self-esteem, and became "fearful, nervous, angry and vulnerable." She alleges she suffered "severe humiliation and distress," as well as "severe mental, psychological, and physical injuries." Her mental injuries allegedly include "severe anxiety, depression, . . . paranoia, vulnerability, sleeplessness, inability to eat, weight loss, and self-doubt."

■ In a civil action under the FEHA, at least, an injured employee is entitled to "all relief generally available in noncontractual actions, including punitive damages . . . ." (*Commodore Home Systems, Inc.* v. *Superior Court*, *supra*, 32 Cal.3d at pp. 215, 221.) It is settled that employment discrimination, particularly that involving sexual harassment, can cause emotional distress and that such distress is compensable under traditional theories of tort law. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 48 [276 Cal.Rptr. 114, 801 P.2d 357].) Compensable emotional distress runs "the full gamut of intangible mental suffering, including . . . 'fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal.' [Citation.]" (*Id.*, at p. 48, fn. 4.)

■ It may be that plaintiff cannot complain of having lost her employment, in that she was never entitled to it in the first place. (*Camp* v. *Jeffers, Mangels, Butler & Marmaro*, *supra*, 35 Cal.App.4th at p. 639.) Nonetheless, she was employed by defendant. Her fraud did not void her employment contract; it merely rendered it voidable should her employer seek to rescind it. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 403, pp. 363-364.)

Contrary to defendant's suggestion, plaintiff's status as an undocumented alien does not bar her from the protections of employment law. In *E.E.O.C. v. Tortilleria La Mejor* (E.D.Cal. 1991) 758 F.Supp. 585, the court construed the protections title VII accords an employee vis-à-vis the IRCA, which makes it illegal to employ an undocumented alien. The court notes the House Judiciary Committee report on the IRCA expressly stated the act was not intended to undermine or diminish labor protections in existing law or to limit EEOC (Equal Employment Opportunity Commission) powers to remedy unfair practices. (*Id.* at pp. 592-593.) Congress therefore did not intend the IRCA to amend or repeal any previously existing statutory labor and employment practices. (*Id.* at p. 593.) In short, the employment discrimination statutes apply to undocumented alien employees notwithstanding the illegality of employing them.

This is only logical. As noted in *Patel* v. *Quality Inn South* (11th Cir. 1988) 846 F.2d 700, certiorari denied (1989) 489 U.S. 1011 [109 S.Ct. 1120, 103 L.Ed.2d 182], in considering the applicability of the Fair Labor Standards Act to undocumented aliens, affording the undocumented coverage is consistent with the IRCA. Any other conclusion would be counterproductive of the congressional intent to limit the hiring of the undocumented and the depressing effect on working conditions caused by their employment. Coverage reduces the incentive to hire such workers. (846 F.2d at pp. 704-705; see also *Sure-Tan, Inc.* v. *NLRB* (1984) 467 U.S. 883, 892 [104 S.Ct. 2803, 2809, 81 L.Ed.2d 732] ["If undocumented alien employees were excluded . . . , there would be created a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining."].)

There is no greater merit to defendant's claim that plaintiff's FEHA claim would be barred simply because she is not a California citizen. *Campbell* v. *Arco Marine, Inc.* (1996) 42 Cal.App.4th 1850 [50 Cal.Rptr.2d 626], on which defendant relies, holds only that a Washington state resident could not sue a California-based employer under the FEHA. (At pp. 1859-1861.)

In short, while plaintiff was employed, she was entitled to all the protections available under employment law. Barring her claim for sexual harassment occurring during the employment relationship would not serve the purposes of the antidiscrimination statutes.

Courts must tread carefully in applying the after-acquired-evidence doctrine to discrimination claims. As noted in *Mardell* v. *Harleysville Life Ins. Co., supra,* 31 F.3d at pages 1236-1237, "The prospect of a defendant's

thorough inquiry into the details of a plaintiff's pre- and post-hiring conduct . . . may chill the enthusiasm and frequency with which employment discrimination claims are pursued, even in cases where the victim of discrimination has nothing to hide, let alone cases where the potential plaintiff is not entirely blameless. Placed in context of the general pervasiveness of resumé fraud and employee misconduct, the likely consequence of the widespread exploitation of after-acquired evidence will be underenforcement of [antidiscrimination statutes], and consequently underdeterrence of discriminatory employment practices." (Fns. omitted.)

One "paramount objective" of the antidiscrimination statutes is " ' "to make persons whole for injuries suffered on account of unlawful employment discrimination." ' [Citations.]" (*Mardell* v. *Harleysville Life Ins. Co.*, *supra*, 31 F.3d at p. 1237.) "[T]he corollary to the make-whole directive is that the protected employee is not to be catapulted into a better position than he or she would have enjoyed had the employer not acted unlawfully. [Citation.] [¶] Keeping in mind the aspiration . . . that the plaintiff should be left in the same position as he or she was in before the discrimination, . . . barring all [employment discrimination claims] would leave the victim in a worse position than had the employer not unlawfully discriminated against him or her . . . , and elevates the employer to a superior position insofar as it lets the employer get off scot-free despite its blameworthy conduct." (*Ibid.*, italics omitted.)

Like the FEHA (see Gov. Code, § 12920), the primary objective of title VII is to end employment discrimination. (*Ford Motor Co.* v. *EEOC* (1982) 458 U.S. 219, 228 [102 S.Ct. 3057, 3063-3064, 73 L.Ed.2d 721].) Toward that end, "[t]he FEHA 'creates direct statutory rights, obligations and remedies between a covered "employer," . . . and those persons it . . . hires for employment.' [Citation.]" (*Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992, 1014, fn. 12 [47 Cal.Rptr.2d 478, 906 P.2d 440], italics omitted.) Denying compensation to a plaintiff for injuries suffered during the employment relationship does not leave the plaintiff in the same position he or she would have been in but for the employer's wrong. In that event, the protective purpose of the antidiscrimination statutes "is entirely lost." (*Welch* v. *Liberty Mach. Works, Inc.* (8th Cir. 1994) 23 F.3d 1403, 1406 (dis. opn. of Arnold, J.).)

Where, as here, the discriminatory conduct was pervasive during the term of employment, therefore, it would not be sound public policy to bar recovery for injuries suffered while employed. In applying the after-acquired-evidence doctrine, the equities between employer and employee can be balanced by barring all portions of the employment discrimination claim tied to the employee's discharge.

The after-acquired-evidence doctrine also should not operate to bar plaintiff's tort claims. The tortious conduct alleged, occurring as it did *before* plaintiff's discharge, did not result in injury caused or justified by conduct attributable to her. It was not her employment as a result of her fraud that caused her injury; it was her employer's alleged tolerance of tortious conduct or its own alleged negligence that caused it. Moreover, no sort of "resumé fraud" could justify an employer's discriminatory abuse of an employee. Accordingly, it would be inequitable to apply the after-acquired-evidence doctrine as a bar. (*Baab* v. *AMR Services Corp.* (N.D.Ohio 1993) 811 F.Supp. 1246, 1262.)

■ The unclean hands doctrine poses no greater barrier to plaintiff's pursuit of her discrimination and tort claims. Whether this doctrine bars recovery "depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." (*Blain* v. *Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060 [272 Cal.Rptr. 250].) *Blain* is itself somewhat analogous case law, in that it involves lying, as does *Feld & Sons* v. *Pechner, Dorfman, Wolfee, etc.* (1983) 312 Pa.Super. 125 [458 A.2d 545].

In *Blain*, the court barred the plaintiff's legal malpractice claims arising from following his attorney's advice to lie under oath. As the court noted, it was lying under oath that induced plaintiff's emotional distress. Inasmuch as the injury was caused by his own misconduct, there was a direct relationship between the misconduct and the harm. (*Blain* v. *Doctor's Co., supra*, 222 Cal.App.3d at p. 1063.) The same analysis applied to plaintiff's claim that he was uninsurable as a result of his perjury and therefore unable to practice medicine. (*Ibid.*) Finally, while claims arising out of the attorney's subsequent advice to sue opposing counsel for abuse of process and malicious prosecution theoretically were independent of plaintiff's misconduct, they were not causally connected to his injury. (*Id.* at pp. 1065-1066.)

In *Feld & Sons*, the court likewise barred legal malpractice and emotional distress claims arising out of legal advice to commit perjury and the plaintiff's subsequent conviction of that offense, but permitted suit to recover fees paid to the attorney. (*Feld & Sons* v. *Pechner, Dorfman, Wolfee, etc., supra*, 458 A.2d at pp. 552, 554-555.) In permitting suit to recover the fees paid, the court reasoned that refusing judicial aid to the client in this respect would permit the wrongdoing attorney to retain ill-gotten gains. Aiding the client was the lesser evil. (*Id.* at pp. 552-554.)

Here, plaintiff's alleged injuries are not the consequences of her fraud but of Atilano's despicable conduct and her employer's tolerance of that conduct. There thus is no direct connection between her wrongdoing and the

harm she suffered. Moreover, refusing her relief would permit her employer to escape the consequences of very serious allegations. It would reward highly condemnable conduct. Aiding plaintiff is the lesser evil. Accordingly, the unclean hands doctrine ought not to apply to her discrimination and tort claims.

▪ Defendant urges that there is an additional reason why plaintiff should be barred from pursuing her tort claims against it. Defendant assumes plaintiff relies on the doctrine of respondeat superior in pursuing such tort claims as assault, battery and false imprisonment against it. All of these claims are based on Atilano's alleged sexual harassment of plaintiff. As a matter of law, however, sexual harassment is not within the scope of employment even where the harassing employee is the plaintiff's supervisor. (*Farmers Ins. Group* v. *County of Santa Clara, supra,* 11 Cal.4th at pp. 1011-1015.) A plaintiff therefore may not hold an employer liable for sexual harassment under the doctrine of respondeat superior.

What this argument fails to recognize is that plaintiff need not necessarily rely upon the doctrine of respondeat superior. A principal is liable when it ratifies an originally unauthorized tort. (*Shultz Steel Co.* v. *Hartford Accident & Indemnity Co.* (1986) 187 Cal.App.3d 513, 519, 523 [231 Cal.Rptr. 715].) The failure to discharge an agent or employee may be evidence of ratification. As noted in *McChristian* v. *Popkin* (1946) 75 Cal.App.2d 249 [171 P.2d 85], "If the employer, after knowledge of or opportunity to learn of the agent's misconduct, continues the wrongdoer in service, the employer may become an abettor and may make himself liable in punitive damages." (At p. 256; accord, *City of Los Angeles* v. *Superior Court* (1973) 33 Cal.App.3d 778, 782-783 [109 Cal.Rptr. 365]; *Coats* v. *Construction & Gen. Laborers Local No. 185* (1971) 15 Cal.App.3d 908, 914 [93 Cal.Rptr. 639]; *Seymour* v. *Summa Vista Cinema, Inc.* (9th Cir. 1987) 809 F.2d 1385, 1388.)

Plaintiff alleges facts which, if proved, could be viewed as establishing defendant's ratification of Atilano's tortious conduct. If so, plaintiff could hold defendant liable for that conduct.

In summary, defendant has offered no sound reason why plaintiff's discrimination and tort claims should be barred, and we have found none. The trial court therefore erred in concluding otherwise.

Plaintiff also asserts the trial court erred in overruling her objections to the evidence defendant presented in support of its summary judgment motion. In

view of the conclusion we have reached above, it is unnecessary to consider the merits of this assertion.

The judgment is reversed. Plaintiff is to recover her costs on appeal.

Masterson, J., and Dunn, J.,* concurred.

---

*Judge of the Municipal Court for the Long Beach Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.