[No. B134878. Second Dist., Div. Five. July 30, 2001.]

TERRY FINEGAN, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Fleishman, Fisher & Moest and Bruce Gelber for Plaintiff and Appellant.

Law Offices of Michael Thomas, Craig Donahue; Greines, Martin, Stein & Richland, Martin Stein and Barry M. Wolf for Defendant and Respondent.

**OPINION**

**WILLHITE, J.***—

### INTRODUCTION

When an employer unlawfully fires or discriminates against an employee, recent federal and California cases hold that the employer may not necessarily escape liability through so-called after-acquired evidence of other wrongdoing by the employee showing he would have been fired for other reasons. At issue here is whether that rule bars expert medical testimony offered to rebut the plaintiff's claim that he was qualified to perform his job, which is an essential element of a cause of action for disability discrimination. As set forth below, we hold such evidence is admissible.

### PROCEDURAL HISTORY

Plaintiff and appellant Terry Finegan (Finegan) appeals from the judgment entered upon special verdict after a jury rejected Finegan's claim that his employer violated state laws protecting the disabled from job discrimination.

Finegan worked as a nurse at the psychiatric ward of Harbor-UCLA Medical Center (the Hospital). The Hospital was owned and operated by defendant and respondent Los Angeles County (County). In January 1997, the Hospital removed Finegan from his job, contending he was no longer

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

physically able to work on the psychiatric ward. He was off work for 18 months until the Hospital found a suitable position for him. In August 1997, Finegan sued the County under the state's Fair Employment and Housing Act (Gov. Code, § 12940, subd. (a), hereafter FEHA), contending he had been the victim of discrimination based upon his physical disabilities. Also named as defendants were Judy Hardy, the Hospital's personnel director, and Balbir Bajwa-Goldsmith, the program director of the psychiatric ward.[1]

A trifurcated jury trial began May 26, 1999, with liability to be tried first, followed by compensatory and punitive damages. On June 11, 1999, the jury rendered a special verdict, finding that Finegan was not qualified to perform the essential functions of his job. Since that was a necessary element of Finegan's prima facie case, judgment for respondents was entered the same day.

## FACTS[2]

Finegan began to work at the Hospital's intensive care unit (ICU) in 1981 and received several back and leg injuries while working there. A 1990 injury to his back and shoulder forced Finegan off work for nearly three years and led him to file a workers' compensation claim.

After shoulder surgery in 1992, Finegan was cleared to return to work in November of that year, with a medical restriction against heavy lifting. Even so, he still had pain, stiffness and a limited range of motion. Finegan took various anti-inflammatory drugs to help with his pain. He also took Vicodin, a prescribed narcotic.

Because of the restriction against heavy lifting, Finegan was no longer able to work in the ICU. In February 1993, Finegan was reassigned to the psychiatric ward. Most of the patients on the ward had been committed involuntarily and were considered dangerous to others. It was an essential function of Finegan's job to intervene, sometimes physically, when patients became disruptive.

Finegan was assaulted by patients in 1993 and early 1994. Both times he sought medical treatment and missed a few days' work. He also filed

---

[1]Bajwa-Goldsmith died before the trial began. We will sometimes refer to the County and Hardy collectively as respondents. Finegan's operative first amended complaint also included causes of action under various federal civil rights laws and for declaratory and injunctive relief. In June 1999, those claims were summarily adjudicated in respondents' favor, leaving only the FEHA claim.

[2]In accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (*Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1383, fn. 1 [74 Cal.Rptr.2d 721].) Our recitation of the facts is derived from the trial testimony and is narrowly tailored to fit the issues raised on appeal.

workers' compensation claims for his injuries. Afterward, he complained of pain in his right leg. Finegan began taking Vicodin three times a day, along with a sleep aid medication called Chlorohydrin.

As part of his workers' compensation claims, Finegan was examined in September 1994 by Dr. Richard Masserman. Masserman's report imposed new work restrictions on Finegan, prohibiting "rapid or vigorous repetitive movements, or prolonged positioning of the neck . . . ." To protect Finegan's upper and lower back, Masserman advised that Finegan "should do no very heavy lifting, repeated heavy lifting or repeated vigorous or rapid bending or twisting movements, . . . ." As for Finegan's right shoulder, he was to do "no repeated vigorous or rapid shoulder movements or very heavy pushing or pulling, or repeated or prolonged overhead activities with the upper right extremity." Despite these restrictions, Masserman's report concluded that Finegan was "capable of working within the recommended limitations, as he is doing and does not require vocational rehabilitation."

Although Masserman's report was sent to the Hospital's workers' compensation insurer, for reasons not entirely clear from the record, it appears that the insurer did not send that report to the Hospital until December 5, 1996. Finegan continued to work during this period and received generally good performance reviews. Even so, Finegan's pain worsened and his use of prescription pain medications increased. In addition to Vicodin, he was taking Xanax, an antianxiety and muscle relaxant medication, which can cause mental confusion, dullness and fatigue. When these medications failed, he would sometimes use a heating blanket to obtain relief. By 1996, he was taking Duragesic, an opiate delivered by way of a three-day patch which was sometimes prescribed for terminal cancer patients.

Finegan sought medical treatment again in April and June 1996 for back pain and other related complaints. By July, he had added the prescription drug Robaxin to his pain relief regimen. Some days, he combined the various medications.

After Finegan began to work in the psychiatric ward, assistant nurse manager Betty Brown noticed that Finegan moved stiffly, tried to avoid certain movements, and appeared to be in pain. Finegan told Brown he had a bad back. Brown tried to protect Finegan from tasks which involved lifting or repetitious motions. She also noticed that he was sometimes physically unable to respond quickly enough to certain problems. In and around 1996, Brown believed Finegan sometimes appeared "glassy-eyed," a condition she attributed to his pain medications. When Brown asked Finegan about this, he explained that he was in more pain and was trying to cut back on his

medications. Brown thought that Finegan was no longer as sharp as he had once been and that he was having bad days more frequently than before.

Finegan was injured again in October 1996 when he tried to stop a patient from escaping. His injuries kept him out of work for one month. When Finegan returned, Brown noticed that he had lost weight, seemed slower, and appeared to be in pain. Concerned about Finegan's condition and the effects of his pain medications, Brown spoke with Corie Green, the nurse manager. Green asked Brown to speak with Finegan, but Brown was unable to do so. Finegan took a week off work in late December 1996 to seek medical treatment for the pain medications he was taking. Finegan told his doctors that he was having difficulty performing his job.

In the meantime, the Hospital's workers' compensation liaison, Connie Olguin, received Masserman's report from the workers' compensation insurer. Olguin informed Bajwa-Goldsmith, who became concerned that the 1994 work restrictions recommended by Masserman placed patients, Finegan, and other nurses at risk.[3] Bajwa-Goldsmith and Green looked at Finegan's history of work injuries and concluded that the movements encompassed by Masserman's restrictions were the ones Finegan made when he was injured. Bajwa-Goldsmith spoke with Brown and learned that Finegan was taking pain medication and was "at times not together, not with it . . . ." A training instructor also told Bajwa-Goldsmith that Finegan had refused to take part in annual physical training, stating that he could not do it. Bajwa-Goldsmith found that information significant.

Bajwa-Goldsmith concluded that Finegan was physically unable to work on the psychiatric ward. Nurses on that ward needed to make quick, repetitive movements to protect themselves and others. Because the nurses must always be on the lookout for danger, that included movements of the neck as well. Bajwa-Goldsmith took her concerns to Hardy, who had the ultimate authority to decide the matter. She told Hardy that if she had known of the restrictions earlier, she would have acted on them.

Relying on Bajwa-Goldsmith's assessment, Hardy notified Finegan on January 23, 1997, that he was not to report to work. The decision was based on the restrictions and Finegan's medical condition. Finegan stipulated to the restrictions as part of his workers' compensation award. In response to interrogatories, Finegan said that because of his orthopedic injuries, he was disabled from performing his duties as a nurse.

In addition to the testimony of the various percipient witnesses, respondents called Dr. Lawrence S. Miller as a medical expert witness to opine

---

[3]Bajwa-Goldsmith's account comes from her deposition testimony, which was put in evidence because she died before trial.

whether Finegan was capable of performing his job duties during the period from 1996 through 1998. Miller examined Finegan in April 1999 and reviewed Finegan's medical records. Based on the extent of Finegan's injuries—as evidenced in part by his use of increasingly stronger pain medications—Miller opined that Finegan had been unable to perform his job during that time. Finegan objected to Miller's testimony, contending that it amounted to after-acquired evidence of wrongdoing which played no part in the Hospital's decision to remove him from the psychiatric ward. His objections were overruled. The admissibility of that evidence is the sole issue on appeal.

## DISCUSSION

Under FEHA, an employer may not discriminate against a worker based on the employee's physical condition or disability. (Gov. Code, § 12940, subd. (a).) Finegan alleged that he had "orthopedic restrictions," which rendered him disabled. According to his first amended complaint, the County violated FEHA because it automatically removed nurses from patient care if they had orthopedic restrictions, without regard to whether a particular nurse could perform the job despite those restrictions.

█ In order to establish a prima facie case under FEHA, Finegan was required to show that he suffered from a disability, was otherwise qualified to do his job, and was subjected to adverse employment action because of his disability. (*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44 [90 Cal.Rptr.2d 15].) Because FEHA is modeled after federal antidiscrimination laws, decisions interpreting the federal statutes are relevant when interpreting similar provisions of FEHA. (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 235 [66 Cal.Rptr.2d 830].) Finegan's appeal turns on one such case—*McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352 [115 S.Ct. 879, 130 L.Ed.2d 852] (*McKennon*)—and its progeny.

1. *After-acquired Evidence and the McKennon Case*

█ When an employer being sued for wrongful termination learns after the fact that the plaintiff-employee committed misconduct that would have led to the termination in any event, that knowledge is called after-acquired evidence. (*Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 842 [77 Cal.Rptr.2d 12] (*Murillo*).) The doctrine provides for an equitable defense related to the concept of "unclean hands." (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1173 [104 Cal.Rptr.2d 95].)

The plaintiff in *McKennon* alleged she was fired because of her age, in violation of the federal Age Discrimination in Employment Act of 1967. (29

U.S.C. § 621 et seq. (ADEA).) The employer moved for summary judgment on the basis of the plaintiff's deposition admission that she had copied several confidential company documents before she was fired. Conceding that it had discriminated against the plaintiff in violation of the ADEA, the defendant argued that this after-acquired evidence would have led to her termination in any event. The federal appeals court affirmed the district court's award of summary judgment, considering the plaintiff's misconduct to be supervening grounds for termination that barred any relief. The Supreme Court granted review to resolve a conflict among the federal appellate courts on the issue.

The issue, as framed by the Supreme Court, was "whether an employee discharged in violation of the [ADEA] is barred from all relief when, after her discharge, the employer discovers evidence of wrongdoing that, in any event, would have led to the employee's termination on lawful and legitimate grounds." (*McKennon, supra,* 513 U.S. at p. 354 [115 S.Ct. at p. 882].) The court's analysis was based on the assumption that plaintiff was fired solely because of her age, in violation of the ADEA. (*Id.* at pp. 356, 359 [115 S.Ct. at pp. 883, 865].) The conflict among the federal appellate courts that *McKennon* sought to resolve was "whether all relief must be denied when an employee has been discharged in violation of the ADEA and the employer later discovers some wrongful conduct that would have led to discharge if it had been discovered earlier." (*Id.* at p. 356 [115 S.Ct. at p. 883].)

Given the broad, remedial nature of the ADEA, and its objectives of both deterrence and compensation, the court held that after-acquired evidence of wrongdoing should not act as a complete bar to an employee's job discrimination action. Instead, the wrongdoing might serve to limit the employee's remedies to backpay, possibly precluding the right to future pay and reinstatement. (*McKennon, supra,* 513 U.S. at pp. 358-359, 361-362 [115 S.Ct. at pp. 885, 886].)

2. *McKennon Is Not Applicable to Dr. Miller's Testimony*

 Finegan's reliance on *McKennon* stems from an interrogatory response by the County, which stated that Finegan was removed from the psychiatric ward on account of Masserman's restrictions. Because Hardy stood by that response at trial, Finegan contends respondents' defense was limited to that basis.[4] He argues that Miller's medical expert testimony falls within *McKennon* since the Hospital did not rely on Miller's conclusions

---

[4]We do not read the record as narrowly as does Finegan. Under examination by her own counsel, Hardy also testified that she relied on Bajwa-Goldsmith's assessment of the

when deciding to remove Finegan. ■ By doing so, he has ignored our previous warnings that "the language of an opinion must be construed in light of the facts of the particular case, an opinion's authority is no broader than its factual setting and the parties cannot rely on a rule announced in a factually dissimilar case." (*Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 60 [92 Cal.Rptr.2d 597]; *Aliberti v. Allstate Ins. Co.* (1999) 74 Cal.App.4th 138, 148 [87 Cal.Rptr.2d 645]; *Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1121 [66 Cal.Rptr.2d 337].)

■ As set forth below, the *McKennon* holding applies when the employer's discriminatory conduct has been established or conceded. If so, the employer may not avoid liability by pointing to some other reason, which would have justified firing the plaintiff-employee, but which was not discovered until later. Decisions which have followed *McKennon* fall into that category. *McKennon* does not apply when the employer disputes liability and relies on later-acquired medical evidence to show the plaintiff was not qualified for the job.

In *O'Day v. McDonnell Douglas Helicopter Co.* (9th Cir. 1996) 79 F.3d 756 (*O'Day*), the plaintiff sued his former employer for age discrimination under the ADEA. The employer learned during discovery that the plaintiff had stolen certain confidential documents and sought summary judgment under the after-acquired evidence doctrine. Applying *McKennon,* the federal appeals court reversed in part, holding that the after-acquired evidence did not bar the plaintiff's entire claim but limited his damages to backpay and any other relief not precluded by *McKennon.* In reaching that conclusion, the *O'Day* court made several pertinent observations. First, the trial court assumed for purposes of the motion that the defendant had in fact discriminated against the plaintiff. (*O'Day, supra,* 79 F.3d at p. 758.) Second, the *McKennon* context exists where "the employer's actual motive for taking the employment action is clear and illegal. . . ." (79 F.3d at p. 760, citation omitted.)

In *Murillo, supra,* 65 Cal.App.4th 833, the plaintiff sued her employer for common law wrongful termination and for sex harassment under FEHA and its federal law counterpart. During discovery, the plaintiff admitted she was an undocumented alien. The defendant then moved for summary judgment, arguing that this after-acquired evidence would have justified its decision to fire plaintiff. The trial court granted the motion.

situation. Bajwa-Goldsmith's conclusions were based in part on her own beliefs concerning Finegan's inability to perform the job and in part on what she learned from Brown, Green and the nursing staff's training instructor. Our analysis is unaffected by these differing views of the evidence.

The appellate court reversed, holding that it violated public policy to bar relief for injuries arising from the employer's discrimination that occurred during the plaintiff's term of employment. (*Murillo, supra,* 65 Cal.App.4th at pp. 847-851.) In doing so, the court noted that the defendant's summary judgment motion relied solely on the after-acquired evidence doctrine and did not seek to adjudicate any other issues. As a result, the court was "not concerned with any of the evidentiary issues underpinning plaintiff's claims." (*Id.* at p. 841.) In short, the defendant conceded that it violated FEHA for purposes of its motion.[5]

When the employer's liability is at issue, however, it may use medical evidence obtained after the fact in order to show that the plaintiff was not qualified for the job. In *Mantolete v. Bolger* (9th Cir. 1985) 767 F.2d 1416 (*Mantolete*)—a decision that predates *McKennon*—the Ninth Circuit Court of Appeals considered the case of an epileptic who was denied a job with the United States Postal Service on the basis she would be exposed to flashing lights that might trigger a seizure. The plaintiff sued under section 501 of the federal Rehabilitation Act. (29 U.S.C. § 791.)[6] The district court entered judgment for the Postal Service.

One issue on appeal was the admissibility of medical evidence concerning the plaintiff's condition which the defendant obtained after rejecting plaintiff's employment application. The plaintiff argued that the evidence was inadmissible since the Postal Service did not rely on it when making its decision. Although it was questionable whether such evidence could be used to enlarge the basis upon which the defendant acted, it was properly admitted to rebut the plaintiff's prima facie showing that she was qualified for the job: "Here, the district court determined that such evidence would be relevant as part of the defendant's efforts to rebut Mantolete's prima facie case of discrimination. The district court did not rely on post-decision evidence to conclude that the Postal Service was reasonable in its rejection of Mantolete's application. The evidence of the appellant's actual medical

---

[5]In *Cooper v. Rykoff-Sexton, Inc.* (1994) 24 Cal.App.4th 614 [29 Cal.Rptr.2d 642], a decision which presaged *McKennon*, the court similarly held that after-acquired evidence of employee wrongdoing could not be used to bar relief for an employee who shows that he performed competently and was fired without cause, in violation of his employment contract or applicable antidiscrimination laws. (*Id.* at p. 618.) In *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620 [41 Cal.Rptr.2d 329], the court distinguished *McKennon* and held that after-acquired evidence of employee wrongdoing which went to the heart of the employment relationship—concealing felony convictions which would have barred their employment in the first instance under applicable federal rules—could be used as a defense to common law wrongful termination claims. (*Id.* at pp. 637-639.)

[6]The Rehabilitation Act was a precursor of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq. (ADA)). (*Black v. Department of Mental Health* (2000) 83 Cal.App.4th 739, 748 [100 Cal.Rptr.2d 39].)

condition was therefore limited to the defendant's claim that Mantolete suffered from a condition that prevented her from performing the essential functions of the job. The evidence was not admitted as an after-the-fact effort to demonstrate a nondiscriminatory motive. Thus, the evidence was admissible to rebut the appellant's claim that she was qualified for the position, but was not admissible to enlarge the basis upon which the employer relied to reject the appellant at the time the decision was made." (*Mantolete, supra,* 767 F.2d at p. 1424.)

The same reasoning was applied by the Second Circuit Court of Appeals in a post-*McKennon* decision—*Teahan v. Metro-North Commuter R. Co.* (2d Cir. 1996) 80 F.3d 50 (*Teahan*). The plaintiff in *Teahan* was fired for excessive absenteeism related to a drug abuse problem, even though he had completed a drug rehabilitation program. His action under the federal Rehabilitation Act was dismissed after a bench trial.

On appeal, he contended the district court violated *McKennon* by admitting expert medical testimony that showed he would likely suffer a relapse. The *Teahan* court disagreed, stating that the evidence was not offered to present an alternative, legitimate reason for the termination but was instead offered to prove that the decision had a reasonable basis under all the facts as they existed at the time of the dismissal. "[T]he issue 'whether the employee is "otherwise qualified" as of the date of termination is forward looking and enables the employer to consider how the employee will perform as compared to nonhandicapped individuals.' [Citation.] Thus, the expert testimony at trial was necessarily predictive. Accordingly, the rule announced in *McKennon* has no application here." (*Teahan, supra,* 80 F.3d at p. 55.)

Finegan cites several decisions to support his reading of *McKennon* or to undercut the precedential value of *Mantolete* and *Teahan*. None is applicable. (*Bragdon v. Abbott* (1998) 524 U.S. 624, 650 [118 S.Ct. 2196, 2210-2211, 141 L.Ed.2d 540] [dentist who was sued under ADA for refusing to treat HIV-infected patient had to rely on objective medical evidence available at the time to make out defense that treating the plaintiff posed a direct threat to his health]; *Kirkingburg v. Albertson's Inc.* (9th Cir. 1998) 143 F.3d 1228, 1235, fn. 7, overruled on other grounds by *Albertson's, Inc. v. Kirkingburg* (1999) 527 U.S. 555 [119 S.Ct. 2162, 144 L.Ed.2d 518] [employer could not rely on after-the-fact court decision invalidating a federal program to justify its decision to fire a truck driver when it in fact fired the driver despite the existence of that program; held factually similar to *McKennon* and *O'Day*]; *Heilweil v. Mt. Sinai Hospital* (2d Cir. 1994) 32 F.3d 718, 724-725 [judgment for defendant employer in ADA case by plaintiff fired after reporting that

working in closed office space aggravated her asthma; just as *Mantolete* held employer may not rely on after-acquired evidence to justify decision to terminate, the employee could not rely on new medical evidence to show she had a qualifying handicap under ADA at time she was fired]; *Bento v. I.T.O. Corp. of Rhode Island* (D.R.I. 1984) 599 F.Supp. 731, 743 [new medical evidence showing defendant was fit to return to work had no bearing on reasonableness of employer's decision based on then available knowledge]; *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 107-109 [69 Cal.Rptr.2d 900, 948 P.2d 412] [in action for breach of employment contract to fire only for cause, employer is not liable for incorrect decision based on good faith, reasonable investigation, as measured by knowledge available at the time].)

Other post-*McKennon* decisions support our analysis. The plaintiff in *McConathy v. Dr. Pepper/Seven Up Corp.* (5th Cir. 1998) 131 F.3d 558, sued her employer, claiming she was fired in violation of the ADA. The employer was granted summary judgment on the ground that the plaintiff was judicially estopped from claiming she was qualified for the job based on a statement in her application for Social Security disability benefits that she was unable to work even part-time. The district court's use of that evidence did not violate *McKennon* because "her statements are being used in this case in relation to her job qualifications, a matter which has nothing to do with the motivation behind her employer's action. *McKennon* involves the use of after-acquired evidence for a different reason than here, and is therefore not on point." (At p. 563.) The court in *Gant v. Wallingford Board of Education* (2d Cir. 1999) 195 F.3d 134, considered a federal civil rights claim brought on behalf of a young child based on allegations the child was demoted from first grade to kindergarten because of his race. The school district was granted summary judgment and the plaintiff appealed. One issue on appeal was the use of an after-the-fact academic assessment to support the defendant's claim that the child was transferred because he was not academically ready for the first grade. The Second Circuit held that use of the evidence did not violate *McKennon* because the defendants did not rely on it to show they would have transferred the child in any event. Instead, they relied on the after-acquired evidence to show that the assessment on which the decision was based was accurate. (At p. 147, fn. 17.)

When synthesized and applied here, these decisions mean that an employer who unlawfully discriminates against an employee may not necessarily rely on after-acquired evidence of previously unknown wrongdoing by the employee to justify its unlawful action. However, where later-acquired medical evidence is offered to support the originally proffered reason and show the plaintiff was not qualified for the job, the evidence is admissible.

(*McKennon, supra,* 513 U.S. at pp. 356, 359-360 [115 S.Ct. at pp. 883, 885]; *Teahan, supra,* 80 F.3d at p. 55; *Mantolete, supra,* 767 F.2d at p. 1424.)

Miller's expert testimony falls squarely within the *Mantolete* and *Teahan* exceptions. The evidence was offered and admitted to rebut Finegan's showing on the prima facie element of his ability to perform his job. Miller testified that he examined Finegan and reviewed Finegan's medical records. Based on that information, Miller opined that by December 1996, Finegan was no longer safely able to perform his job tasks and should have been restricted to a sedentary position. This evidence did not provide legitimate cover for an otherwise unlawful decision. Instead, it bore directly on the reason first given for removing Finegan from the psychiatric ward and rebutted an element of his prima facie case—that he was otherwise qualified for the position. Accordingly, the trial court did not err by permitting Miller's testimony.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondents to recover their costs on appeal.

Turner, P. J., and Grignon, J., concurred.