[No. B196907. Second Dist., Div. Eight. Mar. 26, 2008.]

JOHN TRAVIS, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY
et al., Defendants and Respondents.

336

## Counsel

Rothner, Segall & Greenstone, Glenn Rothner and Jonathan Cohen for Plaintiff and Appellant.

California State University Office of General Counsel, Christine Helwick and Susan Westover for Defendants and Respondents.

## Opinion

**RUBIN, J.**—John Travis appeals from the judgment entered after the trial court denied his mandate petition, which sought a determination that the Board of Trustees of the California State University violated the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) when they met in closed session to discuss former Chancellor Barry Munitz's decision to return from a years-long leave of absence and assume a teaching post. Because the topic of that closed session fell within the act's exception for discussions about personnel matters, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

John Travis is the president of the California Faculty Association, the union that represents faculty members employed at the various campuses within the California State University (CSU) system. He brought a mandate petition (Code Civ. Proc., § 1085) against CSU's board of trustees (the board), as well as board Chairman Murray Galinson and CSU Chancellor Charles B. Reed, alleging that they violated the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) when they met in closed session to discuss former CSU Chancellor Barry Munitz's decision to return from a lengthy leave of absence and assume a guaranteed teaching post at CSU's Los Angeles campus.[1] After considering the parties' briefs and supporting evidence, the trial court determined that the closed session did not violate the Bagley-Keene Act because it fell within an exception for discussing personnel matters. (Gov. Code, § 11126, subd. (a)(1).)[2]

---

[1] We will refer to the Bagley-Keene Open Meeting Act as the Bagley-Keene Act. We will collectively refer to CSU, the board, Galinson, and Reed as respondents. Travis's civil action was authorized by Government Code sections 11130 and 11130.3, which provide an enforcement mechanism for the Bagley-Keene Act.

[2] All further undesignated section references are to the Government Code.

The facts before the trial court were few. Munitz became CSU's chancellor in 1991. At that time, CSU had in place an executive compensation plan known as the "Trustee Professor Program," which granted certain CSU executives a tenured professorship at a CSU campus. Although the Trustee Professor Program was eliminated in 1992, it still applied to Munitz and others who were hired before then.[3] By way of various amendments to the program, a formula was established to set both the salary and office budget of any trustee professor. In July 1997, Munitz announced his plan to resign as chancellor effective January 1998 in order to become president of the J. Paul Getty Trust (the Getty), which oversaw the operations of several prominent institutions, including the Getty Museum. Instead of ending his employment at CSU, however, Munitz exercised his vested right to become a trustee professor. CSU agreed to grant Munitz yearly unpaid leaves of absence so that if he ever left the Getty, he could return to CSU and assume a faculty position. These yearly leaves were requested by Munitz and granted by CSU every April through 2005.

Munitz's time at the Getty was marked by controversy and in February 2006 he resigned.[4] In March 2006, Munitz phoned Reed and said that instead of requesting another yearly leave of absence extension, he intended to return to CSU and assume his post as a trustee professor. According to Reed's declaration, he "anticipated that [Munitz's] return to CSU would also result in publicity" and Reed therefore scheduled the subject as a closed session topic on the board's March 14, 2006 agenda. Reed said that he did so pursuant to the Bagley-Keene Act's exception for personnel-related matters. (§ 11126, subd. (a).) Reed said he "wanted to inform the members of the Board of Dr. Munitz's return before they read about it in the newspapers, and also to advise them that CSU was going to put out a press release regarding the circumstances of the Munitz employment. I also wanted to be able to answer candidly any questions they might have had about this situation. I did not want the Board of Trustees to be surprised about the announcement of this important personnel matter. [¶] . . . Although the actual appointment was made long ago (in 1997), I wanted to make certain that the Board members understood the situation—i.e., that Dr. Munitz had a vested right to return to CSU, and that the University had no choice but to take him back. [¶] . . .

---

[3] Although the Trustee Professor Program was later eliminated, it was replaced by different executive compensation programs.

[4] According to a newspaper article that is part of the appellate record, Munitz had been accused of questionable spending practices. In addition to resigning, Munitz reportedly agreed to resolve his dispute with the Getty by paying the Getty $250,000 and forgoing severance pay and benefits. We express no opinion on the merits of the charges or the circumstances surrounding Munitz's resignation.

During the closed session, there was a candid discussion about Dr. Munitz's circumstances. I cannot disclose the contents of that closed session discussion, because I am required by law to keep it confidential."

On April 19, 2006, Munitz sent Reed a letter to give formal notice of his decision to return to CSU as a trustee professor. After discussing the matter with Board Chairman Galinson, Reed sent Munitz a letter on April 26, 2006, that set forth the duties Reed had decided to assign Munitz.[5] Reed's letter also informed Munitz that his annual salary would be $163,776, and detailed his office supply and staff budget. Munitz's salary and office budget were based on the Trustee Professor Program formula that the board had approved years earlier. His job duties were selected by Reed pursuant to Reed's board-approved discretion to do so. In short, Munitz's return was guaranteed as a matter of right and neither his return, job duties, salary, or office budget required board action of any kind.

Travis's first amended mandate petition alleged that the board violated the Bagley-Keene Act when it met in closed session March 14, 2006, to discuss Munitz's return to CSU as a trustee professor. Travis asked the trial court for a declaration to that effect, and an order that CSU disclose what was said during the closed session. The trial court disagreed, ruling that the closed session was proper because respondents met to consider matters relating to Munitz's employment. The court then entered judgment for respondents. Travis contends the trial court erred by improperly expanding the Bagley-Keene Act's personnel exception for discussions relating to a person's "employment" beyond the initial hiring decision.

## STANDARD OF REVIEW

In reviewing the trial court's judgment in a mandate action, we apply the substantial evidence standard to the trial court's factual findings where the facts are in dispute. We exercise independent review of legal questions and of questions based on undisputed facts. (*Taxpayers for Livable Communities v. City of Malibu* (2005) 126 Cal.App.4th 1123, 1126 [24 Cal.Rptr.3d 493].) The interpretation of statutes is a legal question that calls for independent review. (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 69 [108 Cal.Rptr.2d 715].) " ' "The fundamental rule of

---

[5] These included working to develop the Institute for Urban School Leadership at the CSULA campus, assisting in a campaign to complete the campus's integrated sciences complex, assisting with charter school and biotechnology projects, and teaching a course in the English department or other appropriate department.

statutory construction is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute ' "must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . ." ' . . . If the language of a statute is clear, we should not add to or alter it to accomplish a purpose which does not appear on the face of the statute or from its legislative history." Statutes must be harmonized, both internally and with each other.' [Citation]." (*Pasadena Metro Blue Line Construction Authority v. Pacific Bell Telephone Co.* (2006) 140 Cal.App.4th 658, 663–664 [44 Cal.Rptr.3d 556].)

## DISCUSSION

■ The Bagley-Keene Act requires that, with certain exceptions, "[a]ll meetings of a state body shall be open and public . . . ." (§ 11123, subd. (a).) The policy behind this rule is set forth in section 11120, which states that public agencies and public servants exist to help conduct the public's business, that they may not decide what the public should know, and that the proceedings of public agencies must be conducted openly.[6]

The board does not dispute that it is a state body under the Bagley-Keene Act. (See § 11121.) Nor does it dispute that on March 14, 2006, it held a "meeting" for purposes of that act. (See § 11122.5, subd. (a) ["meeting" under the Bagley-Keene Act includes congregation of majority of members of a state body to hear, discuss, or deliberate on any item that is within its subject matter jurisdiction].) At issue here is whether the board's closed session discussion about Munitz's return from leave of absence was proper under the Bagley-Keene Act's so-called personnel exception, which provides:

---

[6] Section 11120 provides, in part: "It is the public policy of this state that public agencies exist to aid in the conduct of the people's business and the proceedings of public agencies be conducted openly so that the public may remain informed. [¶] In enacting this article the Legislature finds and declares that it is the intent of the law that actions of state agencies be taken openly and that their deliberation be conducted openly. [¶] The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created."

"Nothing in this article shall be construed to prevent a state body from holding closed sessions during a regular or special meeting to consider the appointment, employment, evaluation of performance, or dismissal of a public employee or to hear complaints or charges brought against that employee by another person or employee unless the employee requests a public hearing." (§ 11126, subd. (a)(1).)

The trial court found, and respondents contend, that the term "employment" in section 11126 must be construed to include the circumstances surrounding Munitz's right to return from his leave of absence and assume his job as a trustee professor. Travis contends the trial court erred because the "employment" exception to the Bagley-Keene Act should be narrowly construed to mean only the initial decision to employ someone.

No reported decision has construed the Bagley-Keene Act's personnel exception. As the parties note, however, the Ralph M. Brown Act provides a virtually identical open meeting scheme that is applicable to local public agencies. (§ 54950 et seq.)[7] Several decisions have construed other aspects of the Brown Act's personnel exception, and the parties have rightly relied on those decisions as authority for construing the Bagley-Keene Act's personnel exception.[8] (*Santa Clara Valley Transportation Authority v. Public Utilities Com.* (2004) 124 Cal.App.4th 346, 360 [21 Cal.Rptr.3d 270]; see *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 799–800 [3 Cal.Rptr.3d 703, 74 P.3d 795] [stating that § 11126 "parallels" § 54957, and looking to authority construing the latter to interpret the former].) None, however, has construed what it means to "consider the . . . employment" of a public employee.

■ The personnel exception exists " 'to permit free and candid discussions of personnel matters by a local governmental body.' " (*Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 821 [26 Cal.Rptr.3d 92].) It represents a reasonable compromise by the Legislature, "leaving most personnel matters to be discussed freely and candidly in closed session, but permitting an employee to request an open session to defend against specific complaints or charges brought against him or her by another individual."

---

[7] We will refer to the Ralph M. Brown Act as the "Brown Act." Its purpose and requirements are indistinguishable from the Bagley-Keene Act. (See §§ 54950, 54952.2, 54953.) The Brown Act's personnel exception is identical to that of the Bagley-Keene Act. (See § 54957, subd. (b)(1).)

[8] Accordingly, when we refer to the "personnel exception," we include where applicable both section 11126, part of the Bagley-Keene Act and section 54957, part of the Brown Act.

(*Furtado v. Sierra Community College* (1998) 68 Cal.App.4th 876, 882 [80 Cal.Rptr.2d 589].) However, the exception should be "strictly and narrowly construed and will not be extended beyond the import of [its] terms. [Citation.]" (*San Diego Union v. City Council* (1983) 146 Cal.App.3d 947, 954 [196 Cal.Rptr. 45] (*San Diego Union*).)

Travis contends that the personnel exception's use of the phrase "to consider the appointment [or] employment" of a public employee means nothing more than the initial act of hiring and cannot be expanded to include "any matter related to an individual's status as appointee or employee" after that time. He argues that his interpretation is compelled in part by comparisons with section 11125.2, which requires a state body that has met in closed session to later report publicly on "any action taken . . . to appoint, employ, or dismiss" a public employee, and with section 11121.9, which requires a state body to provide a copy of the Bagley-Keene Act to each new member "upon his or her appointment" to that body. According to Travis, this shows that when the Legislature mentions "employment" (or appointment) in the personnel exception, it means "hiring."

We disagree. By their terms, the sections cited by Travis come into play only when some action has actually been taken—either by hiring a new employee or when a new member of a state body has been appointed. By contrast, section 11126 allows a closed session when a state body is doing nothing more than considering the employment of a public employee regardless of whether it takes any action at that time. (See *Lucas v. Board of Trustees* (1971) 18 Cal.App.3d 988, 992 [96 Cal.Rptr. 431] [Brown Act's personnel exception includes the power to both consider and act in closed session].) If the Legislature had intended to limit section 11126 to the initial hiring decision, it could have easily done so by stating that closed sessions were proper when a state body meets to consider "whether to employ" someone as a public employee. At a minimum, the language is ambiguous and leaves room for doubt as to Travis's proposed interpretation.

Travis also contends that the trial court's interpretation of "employment" violates the rules of statutory interpretation because it effectively swallows the other aspects of the personnel exception—evaluating job performance, considering and imposing discipline, and termination—in effect making them surplusage. (See *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 294 [64 Cal.Rptr.3d 661, 165 P.3d 462] [when a statute contains a list of items, courts will not adopt an expansive meaning of one item that would make the others unnecessary or redundant].) This might be true if, as Travis claims, the phrase "consider the . . . employment" were construed to include all matters related to a public employee's employment status after he is hired. However, that does not

accurately frame the issue, which is best defined as whether Munitz's return from his leave of absence warranted a closed session in order to consider his employment with CSU.

There is authority for reading some flexibility into the provisions of the personnel exception. In *Duval v. Board of Trustees* (2001) 93 Cal.App.4th 902 [113 Cal.Rptr.2d 517] (*Duval*), the court considered whether the Brown Act's personnel exception for the evaluation of an employee's performance applied when a school board met in closed session to discuss performance issues related to one teacher who had already received his formal performance evaluation. On appeal from a summary judgment for the defendant school board, the court acknowledged that the personnel exception must be read narrowly, but rejected the plaintiff's contention that "evaluation of performance" meant nothing more than a formal, periodic, structured review. "In the context of section 54957, the phrase 'to consider the . . . evaluation of performance' clearly is meant to extend to all employer consideration of an employee's discharge of his or her job duties after 'appointment' or 'employment' of the employee, up to (but excluding) 'discipline' or 'dismissal' of the employee." (93 Cal.App.4th at p. 909.)[9] Because the personnel exception was designed to permit candid discussions in closed session about the majority of personnel issues, and because nothing in the statutory language indicated an intent to limit "evaluation of performance" to a formal, periodic review process, the court held that the phrase "encompasses a review of an employee's job performance even if that review involves particular instances of job performance rather than a comprehensive review of such performance." (93 Cal.App.4th at p. 909.)

The *Duval* court did not stop there, however, expanding "evaluation of performance" to include "consideration of the criteria for such evaluation, consideration of the process for conducting the evaluation, and other preliminary matters, to the extent those matters constitute an exercise of defendant's discretion in evaluating a particular employee." (*Duval, supra*, 93 Cal.App.4th at p. 909.) In doing so, the court reasoned that those items were "an integral part of the actual evaluation . . . ." (*Ibid.*) This would necessarily include, the court held, taking action to find the evaluation satisfactory and giving the employee feedback about his evaluation. (*Id.* at pp. 909–910.)

■ Opinions of the California Attorney General have consistently interpreted the personnel exception's use of the term "employment" broadly.

---

[9] Travis contends that *Duval*'s reference to holding a performance evaluation *after* an employee is appointed or employed shows that the phrase "consider the . . . employment" must be defined narrowly to mean nothing more than the initial hiring decision. Because the definition of "employment" within the personnel exception was not at issue in *Duval*, Travis may not rely on it as authority in this case. (*Finegan v. County of Los Angeles* (2001) 91 Cal.App.4th 1, 9 [109 Cal.Rptr.2d 762].)

Those opinions, while not binding on us, are entitled to great weight, especially when the Legislature either amends a statute to conform to such an opinion, or fails to pass an amendment that is contrary to an earlier Attorney General's opinion. (*Orange County Employees Assn., Inc. v. County of Orange* (1993) 14 Cal.App.4th 575, 578, 581–583 [17 Cal.Rptr.2d 695].)

We find the review of three Attorney General opinions and the legislative response to be particularly useful. In 1976, section 54957 did not yet include the evaluation of employee performance exception and permitted closed sessions only "to consider the appointment, employment, or dismissal of a public employee or to hear complaints or charges brought against such employee . . . ." (As amended by Stats. 1975, ch. 959, § 8, p. 2241; see list of amendments, Deering's Ann. Gov. Code (1987 ed.) foll. § 54957, p. 166.) Even so, the Attorney General interpreted the term "employment" to include " 'all personnel matters relating to an individual employee at executive sessions and not simply matters relating to initial employment or final discharge,' " thereby permitting a closed session to evaluate a school superintendent's performance. (59 Ops.Cal.Atty.Gen. 532, 535 (1976).) According to the Attorney General, this interpretation squared with the personnel exception's purpose of sparing public employees "undue publicity and embarrassment." (*Ibid.*) In 1982, the Legislature amended section 54957 consistent with the Attorney General's opinion so as to include performance evaluations (as amended by Stats. 1982, ch. 298, § 2, p. 941; see list of amendments, Deering's Ann. Gov. Code, *supra*, foll. § 54957, p. 166), then did the same for section 11126 in 1997. (As amended by Stats. 1997, ch. 949, § 8; see list of amendments, Deering's Ann. Gov. Code (1997 ed.) foll. § 11126, p. 497.)

The Attorney General later used the same reasoning when concluding that the Brown Act's personnel exception permitted closed session discussions of employee salaries. (61 Ops.Cal.Atty.Gen. 283, 286–287 (1978).) That interpretation was rejected five years later in *San Diego Union, supra*, 146 Cal.App.3d 947. The court agreed that the personnel exception was designed to prevent public embarrassment. (*Id.* at p. 954.) However, it reasoned that requiring public sessions for employee salary decisions was consistent with the Brown Act's stated purposes because those decisions implicated municipal budgetary matters that were a critical part of the government's decision-making process and therefore called for increased public scrutiny. (146 Cal.App.3d at p. 955.) In 1994, the Legislature amended section 54957 by adding subdivision (b)(4), which now states that employee compensation may not be discussed in closed session except when a pay cut was considered as a form of employee discipline. (As amended by Stats. 1994, ch. 32, § 14, p. 347; see list of amendments, Deering's Ann. Gov. Code (2007 Supp.) foll. § 54957, p. 73.)[10]

---

[10] Interestingly and inexplicably, that change was never made to section 11126.

Finally, the Attorney General determined that the term "employment" includes discussions concerning an individual employee's workload. (63 Ops.Cal.Atty.Gen. 153, 155 (1980).) Sections 54957 and 11126 have been amended several times since then, but the Legislature has never taken steps to reject that opinion or otherwise restrict the meaning of "employment."

As mentioned above, the Legislature's reaction to these opinions—by either its inaction or its amendments to incorporate or reject their conclusions—suggests whether they were correct or not. (*Orange County Employees Assn., Inc. v. County of Orange, supra*, 14 Cal.App.4th at pp. 578, 581–583.) Although we do not view this as dispositive, when combined with the holding in *Duval, supra*, 93 Cal.App.4th 902, they do point the way to the following conclusion: a more flexible interpretation of "employment" is permitted when it is consistent with the purposes of both the Brown Act and the personnel exception. We conclude that this is such a case.

First, a return from leave of absence shares a kinship with an employee's employment status in ways that make it at least a cousin of the initial hiring decision. It signals a return to work after his employment status was on hold for some period of time and may well raise questions in the employer's mind over the extent of the employee's right to return, the duties or position he may assume, and the potential displacement and proper reassignment of other employees. Second, it could also raise questions about intervening matters that have some effect on the returning employee's continued fitness to return and might otherwise raise sensitive and personal matters. For example, under the Moore-Brown-Roberti Family Rights Act (CFRA), CSU is obligated to provide leaves of absence to employees who suffer from serious physical or mental illness or who must care for certain family members suffering from such illnesses. (§ 12945.2, subds. (a), (c)(1)–(8).) Although CSU would be required to hold open such an employee's job without loss of status during the leave period (§ 12945.2, subd. (g)), discussions concerning the physical or mental health of the employee or his family member might occur when considering the employee's return to work.[11]

Requiring public sessions to discuss such matters clearly violates the personnel exception's policy of shielding employees from undue publicity and embarrassment. Unlike the critical budgetary decisionmaking issue implicated by employee salaries that motivated the court in *San Diego Union, supra*, 146 Cal.App.3d 947, we see little or no gain for the public's right to listen in on discussions about an employee's return from leave of absence.

---

[11] In fact, Travis's interpretation means that discussions about reassignments, layoffs, vacations, and sick leaves, just to name a few, would also be topics of public sessions. However, we limit our holding to the only issue before us—an employee's return from leave of absence.

Should Travis prevail, these discussions would all become public because they are not part of the initial hiring decision and do not fit within the other specified grounds for invoking the personnel exception.

■ Such a result seems to us to be at odds with the Legislature's intent when it enacted the personnel exception and contrary to the purposes behind that exception. Under the rules of statutory construction, we are therefore obliged to select a construction of the statutory language that comports most closely with the Legislature's apparent intent in a way that promotes the statute's general purpose but does not lead to unreasonable, impractical, absurd, or arbitrary results. (*Commission on Peace Officer Standards & Training v. Superior Court, supra*, 42 Cal.4th at p. 290.)[12] We therefore hold that when the personnel exception authorizes closed sessions to consider the employment of a public employee, it includes discussions about an employee's return from a leave of absence. As set forth next, there was sufficient evidence to show that respondents' closed session meeting about Munitz's return was proper under this interpretation of the personnel exception.

Travis contends the evidence shows that respondents met in closed session for two improper reasons: (1) to determine how best to manage the coming public relations fiasco Munitz's return might cause; and (2) to discuss policy concerns about the executive compensation program that permitted someone like Munitz to return at a salary much greater than that of regular professors. Travis bases these contentions on Reed's statement that he wanted to tell the trustees that a press release would be prepared and on his assertion that the then existing executive compensation program was modified by the board soon after these events. If Travis were correct, we agree that a closed session to discuss such matters would not have been justified under the personnel exception. However, under the applicable substantial evidence test, there is ample evidence to support a contrary finding.

Reed did not say that the board discussed the contents of any planned press release or otherwise considered how to spin Munitz's return. Instead, Reed said that he wanted to let the board know a press release would be prepared. Under the substantial evidence rule, we must take Reed's statement at face value and therefore decline Travis's invitation to read between the lines and speculate that anything more took place. As for discussions concerning policy changes to CSU's executive compensation program, this factual issue was not

---

[12] Travis cites this decision and *International Federation of Professional and Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319 [64 Cal.Rptr.3d 693, 165 P.3d 488], as authority for the proposition that the Bagley-Keene Act's personnel exception should be narrowly construed to match his interpretation. However, both decisions concerned the interpretation of the California Public Records Act, section 6250 et seq., and are inapplicable to the issues before us.

alleged in Travis's mandate petition and was not otherwise raised below. We therefore deem it waived. (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 838, fn. 12 [67 Cal.Rptr.3d 635].)[13] In any event, under the substantial evidence rule, we are not obliged to draw an inference that, because changes might have been made to the executive compensation program after Munitz returned, the topic was discussed during the March 2006 closed session.[14]

■ Instead, the substantial evidence rule compels us to draw inferences that the closed session concerned topics appropriately related to the issue of Munitz's return from his leave of absence. We begin by noting that there is no dispute that the closed session was prompted by Munitz's plan to return from his leave of absence. The evidence showed that Reed knew Munitz was returning under a cloud and wanted to explain to the board why Munitz had a vested right to return and respond candidly to any questions the boardmembers might have about the situation. According to Reed, both he and the trustees spoke during the closed sessions, and a candid discussion about the circumstances of Munitz's return did take place. What might a candid discussion about those circumstances entail? Based on the evidence before the trial court, it is reasonable to infer that the sensitive nature of the accusations against Munitz and their effect on his fitness to return to CSU were under discussion, both of which were proper topics for a closed session under the interpretation of the personnel exception that we adopt today.[15]

---

[13] In his appellate reply brief, Travis cites to a portion of the record that supposedly shows that the board adopted a less generous executive compensation program in November 2006. We have found no such reference in the record. The reply brief also asked us to judicially notice from the board's Web site its November 2006 agenda. We decline to do so.

[14] Travis also makes much of Reed's statements during his deposition that he did not convene the closed session to consider the appointment, employment, performance evaluation, or dismissal of Munitz, and that the closed session was for informational purposes. As Reed clarified in his declaration, he gave that answer because he was not considering whether to hire Munitz, who had a contractual right to return to CSU. Instead, the closed session was convened to discuss the circumstances of Munitz's return. Although Travis contends the deposition testimony acts as some sort of admission that a closed session was improper, it does not alter the essential facts surrounding why that closed session was called and therefore does not alter our analysis.

[15] While the permissible absence of a record of the closed session requires some degree of speculation, such a discussion could likely include whether the Getty allegations permitted CSU to void its contractual obligation to Munitz, and would then inevitably turn to the merits of those allegations. It could well include questions about any past allegations of wrongdoing while Munitz served as chancellor, as well as a frank and candid assessment of Munitz's character and personality in general. All of these would likely rely on personal or hearsay recollections of rumor, innuendo, or speculation. Given the nature of the Getty allegations, the board might well have discussed whether Munitz should be placed in a position that gave him access to or authority over CSU funds, as well as the need to monitor Munitz's activities after his return.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondents shall recover their costs on appeal.

Cooper, P. J., and Flier, J., concurred.